**FILED**
**CHARLOTTE, NC**

JUL 26 2012

**US DISTRICT COURT**
**WESTERN DISTRICT OF NC**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | DOCKET NO. 3:12CR239-FDW |
| v. | **BILL OF INDICTMENT** |
| (1) RAMIN AMINI | |
| (2) VONETTA TYSON BARNES | Violations: |
| (3) TRAVIS BUMPERS | |
| (4) GLYNN HUBBARD | 15 U.S.C. § 78j(b) |
| (5) VICTORIA HUNT | 15 U.S.C. § 78ff |
| (6) TOBY HUNTER | 18 U.S.C. § 371 |
| (7) STEVEN JONES | 18 U.S.C. § 1343 |
| (8) JOHN MCDOWELL | 18 U.S.C. § 1344 |
| (9) KUROSH MEHR | 18 U.S.C. § 1956(h) |
| (10) ANN TYSON MITCHELL | 18 U.S.C. § 1962(d) |
| (11) JOHN WAYNE PERRY, JR. | 21 U.S.C. § 841 |
| (12) DONTE THOROGOOD | 21 U.S.C. § 846 |
| (13) CARRIE TYSON | |
| (14) JAMES TYSON, JR. | |
| (15) JAMES TYSON, SR. | |
| (16) NATHAN SHANE WOLF | |
| (17) PURNELL WOOD | |

I. THE ENTERPRISE............................................................................................................... 1

II. THE PURPOSES OF THE ENTERPRISE ............................................................................. 1

III. THE INDIVIDUALS AND ENTITIES ASSOCIATED WITH THE ENTERPRISE ..................... 2

    A. The Leaders............................................................................................................. 2

    B. The Promoters and Facilitators ............................................................................. 3

    C. The Mortgage Brokers ........................................................................................... 4

    D. The Lawyers and Paralegals ................................................................................. 5

    E. The Real Estate Agents........................................................................................... 5

    F. The Appraisers ........................................................................................................ 6

    G. The Builders............................................................................................................. 6

    H. The Buyers ............................................................................................................... 7

    I. Bank and Financial Services Insiders ................................................................... 8

    J. The Corporations and Entities .............................................................................. 8

IV. FINANCIAL INSTITUTIONS AND LENDERS ................................................................... 11

V. THE MEANS AND METHODS OF THE ENTERPRISE......................................................... 12

VI. THE PATTERN OF RACKETEERING ACTIVITY.............................................................. 14

    A. Acts of Investment and Securities Fraud ............................................................ 14

        (1) The Investment and Securities Fraud Scheme Generally ............................ 14

        (2) Brighton Developers ..................................................................................... 14

        (3) Sovereign Equity........................................................................................... 18

        (4) Prestige.......................................................................................................... 22

        (5) Global Motorist and Elite Automotive a/k/a Phil Ford Automotive .......... 24

        (6) Additional Acts of Investment Fraud............................................................ 26

    B. Mortgage Fraud................................................................................................... 27

        (1) The Mortgage Fraud Scheme Generally ...................................................... 27

        (2) March 28, 2005: Activity Related to 2131 Rolston Drive, Charlotte .......... 29

        (3) August 30, 2006: Activity Related to 6800 Linkside Court, Charlotte ....... 31

        (4) August 30, 2006: Activity Related to 2318 La Maison Drive, Charlotte ..... 33

        (5) September 29, 2006: Activity Related to 6510 Pembry Links Circle, Charlotte..34

        (6) December 7, 2006: Activity Related to 6510 Pembry Links Circle, Charlotte ....36

        (7) December 13, 2006: Activity Related to 2131 Rolston Drive, Charlotte ..........37

(8) Subsequent Distribution of Fraudulent Proceeds from 6510 Pembry Links Circle and 2131 Rolston Drive ...........................39

(9) January 4, 2007: Activity Related to 1040 Spyglass, Marvin.........................40

(10) February 16, 2007: Activity Related to 606 Beauhaven Lane, Waxhaw.............41

(11) February 20, 2007: Activity Related to 5020 Oxfordshire Road, Waxhaw.........43

(12) February 26, 2007: Activity Related to 2718 Crane Road, Waxhaw ...............45

(13) March 20, 2007: Activity Related to 9911 Strike the Gold Lane, Waxhaw........47

(14) March 22, 2007: Activity Related to 2817 Cutter Court, Waxhaw ...............49

(15) April 9, 2007: Activity Related to 9115 Woodhall Lake Drive, Waxhaw ..........50

(16) April 12, 2007: Activity Related to 9215 Woodhall Lake Drive, Waxhaw .........52

(17) April 27, 2007: Activity Related to 7824 Clover Vale Drive, Waxhaw.............54

(18) May 7, 2007: Activity Related to 1212 Lookout Circle, Waxhaw .................56

(19) June 20, 2007: Activity Related to 606 Beauhaven Lane, Waxhaw................57

(20) July 12, 2007: Activity Related to 8304 Skye Lochs Drive, Waxhaw .............59

(21) August 7, 2007: Activity Related to 1625 Lookout Circle, Waxhaw...............60

(22) August 17, 2007: Lots 31, 32, 38, 39, and 42 Chambery Subdivision .............62

C. Distribution of Illegal Drugs.................................................................. 63

D. Bank Bribery....................................................................................... 63

(1) Manner and Means of the Bank Bribery Conspiracy...........................63

(2) Overt Acts of the Bank Bribery Conspiracy ...................................64

E. Perjury............................................................................................... 65

COUNT ONE............................................................................................... 67

COUNT TWO.............................................................................................. 69

COUNT THREE........................................................................................... 70

COUNT FOUR ............................................................................................ 71

COUNT FIVE.............................................................................................. 72

COUNT SIX ............................................................................................... 73

NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE ..................... 74

## THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

## I.   THE ENTERPRISE

1.   The defendants listed below, and others known and unknown to the Grand Jury, were members and associates of the Enterprise, a criminal organization whose members and associates engaged in investment and securities fraud, bank and mortgage fraud, wire fraud, and the distribution of illegal drugs, and which operated principally in the cities of Charlotte and Waxhaw, North Carolina

2.   The Enterprise, including its leadership, members, and associates to include the corporations and entities listed below in paragraphs sixty-four through ninety-one, constituted an "Enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the Enterprise"), that is, a group of individuals and entities associated-in-fact. The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

3.   The Enterprise stole more than $75 million from investors, financial institutions, and lenders.

## II.   THE PURPOSES OF THE ENTERPRISE

4.   The purposes of the Enterprise included, but were not limited to, the following:

a.   Enriching the members and associates of the Enterprise through, among other things, engaging in investment and securities fraud, mortgage fraud, and the distribution of illegal drugs;

b.   Soliciting, through false and fraudulent promises and misrepresentations, professional athletes and professionals, such as doctors and lawyers, to invest tens of thousands to millions of dollars in sham companies controlled by the Enterprise;

c.   Soliciting individuals, through false and fraudulent promises and misrepresentations, to take out loans from financial institutions and sign those loan proceeds over to the Enterprise for purported investment in sham companies controlled by the Enterprise;

d.   Recruiting to the Enterprise additional members and associates that held licenses and positions of trust in the real estate industry, such as attorneys, mortgage brokers, appraisers, and real estate agents;

e.    Engaging in mortgage fraud transactions by purchasing real estate in Charlotte and Waxhaw, North Carolina, and elsewhere with straw borrowers and fraudulent information;

f.    Acquiring luxury homes in Charlotte and Waxhaw, North Carolina, in the names of straw buyers that members and associates of the Enterprise could live in, enjoy, and use for various other purposes of the Enterprise;

g.    Acquiring luxury automobiles for the Enterprise, generally in other people's names and through false representations;

h.    Funding additional acts of criminality with money laundered from previous acts of fraud; and

i.    Concealing the true nature of the Enterprise through deceptive activities and through false and misleading statements to victims, members of the community, and law enforcement.

### III.    THE INDIVIDUALS AND ENTITIES ASSOCIATED WITH THE ENTERPRISE

5.    The Enterprise was led by four individuals and included a core group of individuals for each its investment fraud and mortgage fraud operations, along with numerous other individuals who were recruited into the Enterprise, serving various roles at various times, all functioning together as a continuing unit for the common purpose of achieving the objectives of the Enterprise.

6.    As set forth below, individuals in the Enterprise, depending on the time and transaction, generally participated in the activities of the Enterprise in one or more of the following roles: (1) leader; (2) promoter or facilitator; (3) mortgage broker; (4) lawyer or paralegal; (5) real estate agent; (6) appraiser; (7) builder; (8) buyer; and/or (9) bank or financial services insider.

### A.    The Leaders

7.    Defendant RAMIN AMINI ("AMINI") was a leader of the Enterprise and served the Enterprise as a promoter for its mortgage fraud operations.

8.    Defendant VICTORIA HUNT ("HUNT") was a leader of the Enterprise and served the Enterprise as a promoter for both its investment and mortgage fraud operations.

9.    Defendant CARRIE TYSON ("CARRIE TYSON") was a leader of the Enterprise and served the Enterprise as a promoter for both its investment and mortgage fraud operations. CARRIE TYSON also is TYSON's mother.

10.    Defendant JAMES TYSON, JR. ("TYSON") was a leader of the Enterprise and served the Enterprise as a promoter for both its investment and mortgage fraud operations.

## B. The Promoters and Facilitators

11. The promoters and facilitators of the Enterprise generally served the role of recruiting others to join, participate in, and/or provide funds for the activities of the Enterprise and/or organizing, facilitating and managing the individual transactions carried out by the Enterprise.

12. Defendant VONETTA TYSON BARNES ("BARNES") served the Enterprise as a promoter for its investment fraud operations.

13. Defendant TRAVIS BUMPERS ("BUMPERS") served the Enterprise as a promoter for its investment and mortgage fraud operations.

14. Kimithi "Kippy" Davis ("Davis"), a co-conspirator unindicted herein, served the Enterprise as a promoter for its mortgage fraud operations.

15. Ericka L. Flood, a/k/a Ericka Lomick, ("Flood"), a co-conspirator unindicted herein, served the Enterprise as a promoter, using her position as a mortgage broker to be a go-between for Lee, TYSON and BUMPERS and the bank employees in the bank bribery scheme.

16. Defendant GLYNN HUBBARD ("HUBBARD") served the Enterprise as a promoter for its mortgage fraud operations.

17. Defendant TOBY HUNTER ("HUNTER") served the Enterprise as a promoter for its investment fraud operations.

18. Defendant STEVEN JONES ("JONES") served the Enterprise as a promoter for its investment fraud operations.

19. Defendant JOHN MCDOWELL ("MCDOWELL") served the Enterprise as a promoter for its investment fraud operations.

20. Defendant KUROSH MEHR ("MEHR") served the Enterprise as a promoter and a buyer for its mortgage fraud operations.

21. Defendant ANN TYSON MITCHELL ("MITCHELL") served the Enterprise as a facilitator for its mortgage fraud operations.

22. Elizabeth McPhaul ("McPhaul"), a co-conspirator unindicted herein, served the Enterprise as a promoter for its mortgage fraud operations.

23. Sherrill Miller Panayoton ("Panayoton"), a co-conspirator unindicted herein, served the Enterprise as a facilitator of its mortgage fraud operation. Panayoton's father was A.M., a victim of the Enterprise.

24. Defendant JOHN WAYNE PERRY, JR. ("JOHN PERRY") served the Enterprise as a promoter for its mortgage fraud operations.

25. Kim Cherrie Perry ("Kim Perry"), a co-conspirator unindicted herein, served the Enterprise as a promoter for its mortgage fraud operations. Kim Perry also was JOHN PERRY's sister.

26. Rick Lee Phillips ("Phillips"), a co-conspirator unindicted herein, served the Enterprise as a promoter for its mortgage fraud operations.

27. Kelvis Smith ("Kelvis Smith"), a co-conspirator unindicted herein, served the Enterprise as a promoter for its mortgage fraud operations.

28. Alicia Renee Taylor ("Taylor"), a co-conspirator unindicted herein, served the Enterprise as a facilitator of its mortgage fraud operations.

29. Defendant DONTE THOROGOOD ("THOROGOOD") served the Enterprise as a promoter for its mortgage fraud operations.

30. Defendant JAMES TYSON, SR. ("JAMES TYSON SR.") served the Enterprise as a promoter for its investment fraud operations. JAMES TYSON SR. also is TYSON's father.

31. Phillip Wellington ("Phillip Wellington"), a co-conspirator unindicted herein, served the Enterprise as a promoter for its mortgage fraud operations.

32. Defendant PURNELL WOOD ("WOOD") served the Enterprise as a promoter for its mortgage fraud operations.

## C. The Mortgage Brokers

33. The mortgage brokers in the Enterprise were licensed loan officers whose role in the Enterprise generally was to secure mortgages for the mortgage fraud transactions carried out by the Enterprise.

34. Crystal Goodson-Hudson ("Goodson-Hudson"), a co-conspirator unindicted herein, served the Enterprise as a mortgage broker for its mortgage fraud operations. Goodson-Hudson was a licensed loan officer employed by several mortgage brokerage companies in Charlotte, North Carolina.

35. Elena Karadzhova ("Karadzhova"), a co-conspirator unindicted herein, served the Enterprise as an assistant to Sean Dalton Williams, who was a mortgage broker for the Enterprise's mortgage fraud operations.

4

36. Robert J. Mahaney, Jr. ("Mahaney"), a co-conspirator unindicted herein, served the Enterprise as a mortgage broker for its mortgage fraud operations. Mahaney was a licensed loan officer employed by several mortgage brokerage companies in Charlotte, North Carolina.

37. Angelia Osborne ("Osborne"), a co-conspirator unindicted herein, served the Enterprise as a mortgage broker for its mortgage fraud operations. Osborne was a licensed loan officer in Charlotte, North Carolina.

38. Danielle Vaughn ("Danielle Vaughn"), a co-conspirator unindicted herein, served the Enterprise as a mortgage broker for its mortgage fraud operations. Danielle Vaughn was a licensed loan officer employed by several mortgage brokerage companies in Charlotte, North Carolina.

39. Sean Dalton Williams ("Sean Williams"), a co-conspirator unindicted herein, served the Enterprise as a mortgage broker for its mortgage fraud operations. Sean Williams was a licensed loan officer, a certified public accountant, and owned a mortgage company associated with the Enterprise, SW Mortgage Group, LLC, in Charlotte, North Carolina.

**D.    The Lawyers and Paralegals**

40. The lawyers of the Enterprise were licensed professionals whose role in the Enterprise was generally to work to ensure the legal paperwork was prepared and that the fraudulently obtained loans closed so that mortgage fraud transactions of the Enterprise could be completed.

41. Christine Gates ("Gates"), a co-conspirator unindicted herein, served the Enterprise as an attorney for its mortgage fraud operations. Gates was licensed with the State of North Carolina and was the owner of the Gates Law Firm, PLLC, in Charlotte, North Carolina.

42. Kelli A. Norwood ("Norwood"), a co-conspirator unindicted herein, served the Enterprise as a paralegal for its mortgage fraud operations. Norwood was an employee of the Settlement Source, a settlement company that conducted real estate closings in the Ballantyne area of Charlotte, North Carolina.

43. Demetrius G. Rainer ("Rainer"), a co-conspirator unindicted herein, served the Enterprise as an attorney for its mortgage fraud operations. Rainer was licensed with the State of North Carolina and was the owner of the Law Office of Demetrius G. Rainer PLLC, a law firm located in Charlotte, North Carolina.

**E.    The Real Estate Agents**

44. The real estate agents in the Enterprise were licensed professionals whose role in the Enterprise was generally to serve as agents for the properties, facilitate negotiations between the promoters and other parties to the transactions, provide or facilitate financing for the fraudulent deals, and assist in distributing the fraudulent proceeds of the transactions of the Enterprise.

45. Shannon Lee ("Lee"), a co-conspirator unindicted herein, served the Enterprise as a real estate agent for its mortgage fraud operations. Lee was a licensed real estate agent who owned and operated New Millennium Brokerage Services, an entity that the Enterprise used to receive kickbacks and proceeds of its mortgage fraud operations. Lee also participated in the scheme to bribe bank employees to obtain falsified documents for use in the Enterprise's mortgage fraud operations.

46. Holly Pasut ("Pasut"), a co-conspirator unindicted herein, served the Enterprise as a real estate agent for its mortgage fraud operations. Pasut was a licensed real estate agent and was employed by real estate agencies located in the Ballantyne area of Charlotte, North Carolina.

47. Marcia Williams ("Marcia Williams"), a co-conspirator unindicted herein, served the Enterprise as a real estate agent for its mortgage fraud operations. Marcia Williams was a licensed real estate agent and was employed by a real estate firm in Charlotte, North Carolina. Marcia Williams also participated in the scheme to bribe bank employees to obtain falsified documents for use in the Enterprise's mortgage fraud operations and to assist the Enterprise in inducing victims to obtain loans and turn those loan proceeds over to the Enterprise as part of its investment fraud operations.

48. Defendant NATHAN SHANE WOLF ("WOLF") served the Enterprise as a real estate agent for its mortgage fraud operations. Wolf was a licensed real estate agent employed by real estate agencies located in the area of Charlotte, North Carolina.

**F. The Appraisers**

49. Clinton Darden ("Darden"), a co-conspirator unindicted herein, who owned and controlled ValueEstimators, Inc., fraudulently inflated appraisals for the properties that were the subject of the transactions of the Enterprise.

**G. The Builders**

50. The builders who worked with the Enterprise served the role of providing properties that would be the subject of the mortgage fraud transactions and agreeing to hidden kickbacks paid to members of the Enterprise.

51. Mark Wittig ("Wittig"), a co-conspirator unindicted herein, worked with the Enterprise as a builder for its mortgage fraud operations. Wittig was the owner of Touchstone Homes, a luxury homebuilder doing business in Union and Mecklenburg Counties.

52. Gary Wood ("Wood"), a co-conspirator unindicted herein, worked with the Enterprise as a builder for its mortgage fraud operations. Gary Wood was the owner of Gary Wood Construction, Inc., a luxury homebuilder doing business in Union and Mecklenburg Counties. Gary Wood also was a licensed real estate agent.

## H. The Buyers

53. The buyers who worked with the Enterprise were individuals whose role was generally to purchase the property for the Enterprise at an inflated price, trading their name and credit for kickbacks.

54. Kirk Hillian ("Hillian"), a co-conspirator unindicted herein, served the Enterprise as a buyer for its mortgage fraud operations. Specifically, Hillian served as the buyer of 2718 Crane Road, Waxhaw, North Carolina, for an inflated price of $1,800,000, in exchange for a kickback of $120,000 from the Enterprise.

55. George Moore ("Moore"), a co-conspirator unindicted herein, served the Enterprise as a buyer for its mortgage fraud operations. Specifically, Moore served as the buyer of 6510 Pembry Links, Charlotte, North Carolina, for an inflated price of $1,260,000 and the buyer of 2131 Rolston Drive, Charlotte, North Carolina, for an inflated price of $2,100,000, in exchange for a kickback of $125,000 from the Enterprise.

56. Kevin Smith ("Kevin Smith"), a co-conspirator unindicted herein, served the Enterprise as a buyer for its mortgage fraud operations. Specifically, Kevin Smith served as the buyer of 1212 Lookout Circle, Waxhaw, North Carolina, for an inflated price of $1,470,000, in exchange for a kickback of $245,599 from the Enterprise.

57. Glenna Tyler ("Tyler"), a co-conspirator unindicted herein, served the Enterprise as a buyer for its mortgage fraud operations. Specifically, Tyler served as the buyer for 8304 Skye Lochs Drive, Waxhaw, North Carolina, for an inflated price of $1,400,000, in exchange for a kickback of $79,010 from the Enterprise.

58. Mary Vaughn ("Mary Vaughn"), a co-conspirator unindicted herein, served the Enterprise as a buyer for its mortgage fraud operations. Specifically, Mary Vaughn served as the buyer of 6800 Linkside Court, Charlotte, North Carolina, for an inflated price of $1,400,000 and the buyer of 1040 Spyglass, Marvin, North Carolina, for an inflated price of $1,629,000, in exchange for promised kickbacks of $50,000 per house, and the Enterprise paying her bills while she was unemployed.

59. Jamaine Wallace ("Wallace"), a co-conspirator unindicted herein, served the Enterprise as a buyer for its mortgage fraud operations. Specifically, Wallace served as a buyer for 2817 Cutter Court, Waxhaw, North Carolina, for an inflated price of $1,750,000 in exchange for a kickback of $219,387.81.

60. William Wellington ("William Wellington"), a co-conspirator unindicted herein, served the Enterprise as a buyer for its mortgage fraud operations. Specifically, William Wellington served as a buyer of 10001 Strike the Gold Lane, Waxhaw, North Carolina, for an inflated price of $2,200,000 in exchange for a kickback of $161,179.

## I. Bank and Financial Services Insiders

61. Jamilia N. Brown ("Brown"), a co-conspirator unindicted herein, was an assistant branch manager for Bank of America at a branch in the Cotswold area of Charlotte, North Carolina, who accepted bribes for providing falsified documents for use in the Enterprise's mortgage fraud operations.

62. Danyelle Eason ("Eason"), a co-conspirator unindicted herein, was an employee of Wachovia Bank, who accepted bribes to verify false verifications of deposit for the Enterprise as part of its mortgage fraud operations.

63. Vic F. Henson, f/n/a Vic F. Gray, ("Henson"), a co-conspirator unindicted herein, was a bank manager for Bank of America at a branch in the Steele Creek area of Charlotte, North Carolina, who accepted bribes for providing falsified documents for use in the Enterprise's mortgage fraud operations.

## J. The Corporations and Entities

64. Brighton Developers, LLC, and related entities (collectively, "Brighton Developers") were members of, and associated with, the Enterprise. Brighton Developers was used primarily (a) to solicit and receive money from investor victims; and (b) to fund fraudulent mortgage transactions; and (c) to receive and distribute the proceeds from such mortgage frauds. TYSON, CARRIE TYSON, and HUNT exercised primary control over Brighton Developers for the Enterprise.

65. Camron Transportation ("Camron Transportation") was a member of, and associated with, the Enterprise. Camron Transportation was a trucking company that AMINI owned and exercised primary control over for the Enterprise. AMINI used Camron Transportation to receive criminal proceeds from, and to pay the expenses of, the mortgage fraud operations of the Enterprise. AMINI used his trucking operations to solicit victims for the investment fraud operations of the Enterprise and facilitated the Enterprise's drug trafficking by providing trucks for TYSON and other members of the Enterprise to transport marijuana.

66. CareerSource USA ("CareerSource") was a member of, and associated with, the Enterprise. CareerSource was used to receive the kickbacks of fraudulent mortgage transactions. Panayoton exercised primary control over CareerSource for the Enterprise.

67. CGC Construction LLC ("CGC") was a member of, and associated with the Enterprise. CGC was used to receive and distribute proceeds of the mortgage fraud scheme. Panayoton exercised primary control over CGC for the Enterprise.

68. Charlotte Business Investor Group, LLC ("CBIG") was a member of, and associated with, the Enterprise. CBIG was used primarily (a) to solicit and receive money from investor victims; (b) to fund fraudulent mortgage transactions; and (c) to receive and distribute the

proceeds from such mortgage frauds. HUNT exercised primary control over CBIG for the Enterprise.

69. Demetrius G. Rainer PLLC, ("Rainer Firm") was a member of, and associated with, the Enterprise. The Rainer Firm was used to close fraudulent real estate transactions. Rainer exercised primary control over the Rainer Firm for the Enterprise.

70. Elite Automotive Group, LLC a/k/a Phil Ford Automotive, and related entities (collectively, "Elite Automotive") was a member of, and associated with, the Enterprise. Elite Automotive was used to solicit and receive money from investor victims. TYSON, HUNT, BARNES, and JAMES TYSON SR. exercised primary control over Elite Automotive for the Enterprise.

71. G. Moore Investments LLC ("Moore Investments") was a member of, and associated with, the Enterprise. Moore Investments was used primarily to receive kickbacks from the fraudulent mortgage transactions. Moore exercised primary control over Moore Investments for the Enterprise.

72. Gary Wood Construction, Inc. ("Wood Construction") was a member of, and associated with, the Enterprise. Wood Construction was used primarily to sell luxury homes to the Enterprise for inflated prices in exchange for kickbacks. Gary Wood exercised primary control over Wood Construction for the Enterprise.

73. Gates Law Firm, PLLC ("Gates Firm"), was a member of, and associated with, the Enterprise. The Gates Firm was used to close fraudulent mortgage fraud transactions. Gates exercised primary control over the Gates Firm for the Enterprise.

74. Global Motorist LLC, ("Global Motorist"), a/k/a Prestige Auto Body and Repair, was a member of, and associated with, the Enterprise. Global Motorist was used to solicit and receive money from investor victims. TYSON, HUNT, MCDOWELL and JAMES TYSON SR. exercised primary control over Global Motorist for the Enterprise.

75. I & Associates ("I & Associates") was a member of, and associated with, the Enterprise. I & Associates was used primarily to receive kickbacks from the fraudulent mortgage transactions. Kevin Smith exercised primary control over I & Associates for the Enterprise.

76. Inspiron Holdings LLC ("Inspiron") was a member of, and associated with, the Enterprise. Inspiron, which was purportedly based in Hawaii, was used to solicit and collect money from investor victims. BARNES exercised primary control over Inspiron for the Enterprise.

77. Lace & Company ("Lace & Co.") was a member of, and associated with, the Enterprise. Lace & Co. was used to fund fraudulent mortgage transactions and to receive the proceeds from such mortgage fraud. MITCHELL exercised primary control over Lace & Co. for the Enterprise.

78. Metro Investment Group, LLC ("Metro Investment") was a member of, and associated with, the Enterprise. Metro Investment was used to fund fraudulent mortgage transactions and to receive the proceeds from such mortgage fraud. TYSON and CARRIE TYSON exercised primary control over Metro Investment for the Enterprise.

79. Network Imports ("Network Imports") was a member of, and associated with, the Enterprise. AMINI used Network Imports to fund fraudulent mortgage transactions and to receive and distribute the proceeds from such mortgage frauds.

80. New Century Homes of Carolina, Inc. ("New Century") was a member of, and associated with, the Enterprise. New Century was used primarily to fund fraudulent mortgage transactions and to receive and distribute the proceeds from such mortgage frauds. BUMPERS exercised primary control over New Century for the Enterprise.

81. New Millennium Brokerage Services ("New Millennium") was a member of, and associated with, the Enterprise. New Millennium was used primarily to arrange fraudulent mortgage transactions and to receive and distribute proceeds from such mortgage fraud. Lee exercised primary control over New Millennium for the Enterprise.

82. Prestige Capital Advisors, Prestige Capital Partners and related entities (collectively, "Prestige") were members of, and associated with, the Enterprise. Prestige was based out of Charlotte, North Carolina, and purported to have offices in Atlanta and St. Louis. Prestige was used to solicit and receive money from investor victims. TYSON, HUNT and HUNTER exercised primary control over Prestige for the Enterprise.

83. ProBowl Brokerage ("ProBowl") was a member of, and associated with, the Enterprise. ProBowl was used to receive and distribute the proceeds from fraudulent mortgage transactions. Davis exercised primary control over ProBowl for the Enterprise.

84. The Settlement Source ("The Settlement Source") was an escrow company used by the Enterprise. The Settlement Source, which employed Kelli Norwood, was an escrow company used to conduct real estate closings for the Enterprise.

85. Sovereign Equity Group, Inc. and related entities (collectively, "Sovereign Equity") were members of, and associated with, the Enterprise. Sovereign Equity was based out of Charlotte, North Carolina, and purported to have additional offices in Manhattan, New York, St. Louis, Missouri, London, England, and Zurich, Switzerland. Sovereign Equity primarily was used to solicit and collect money from investor victims. TYSON, HUNT, and BARNES exercised primary control over Sovereign Equity for the Enterprise.

86. Stir, LLC ("Stir") was a member of, and associated with, the Enterprise. Stir primarily was used to fund, receive, and distribute proceeds of the fraudulent mortgage transactions. Phillips exercised primary control over Stir for the Enterprise.

87. SW Mortgage Group, LLC ("SW Mortgage") was a member of, and associated with, the Enterprise. SW Mortgage was used primarily to process fraudulent mortgage applications for the mortgage fraud operations. Sean Williams exercised primary control over SW Mortgage for the Enterprise.

88. Touchstone Homes ("Touchstone") was associated with the Enterprise. Touchstone was used primarily to sell luxury homes to the Enterprise for inflated prices in exchange for kickbacks. Wittig exercised primary control over Touchstone.

89. United Business Concepts LLC ("UBC") was a member of, and associated with, the Enterprise. UBC was used to provide false employment verifications. Phillips exercised primary control over UBC for the Enterprise.

90. ValuEstimators, Inc. ("ValuEstimators") was a member of, and associated with, the Enterprise. ValuEstimators was used to obtain inflated appraisals for the mortgage fraud operations. Darden exercised primary control over ValuEstimators for the Enterprise.

91. Yasmin Construction ("Yasmin Construction") was a member of, and associated with, the Enterprise. Yasmin Construction was used to fund fraudulent mortgage transactions and to receive and distribute the proceeds from such mortgage fraud. AMINI exercised primary control over Yasmin Construction for the Enterprise.

## IV. FINANCIAL INSTITUTIONS AND LENDERS

92. American Broker's Conduit ("ABC") was a mortgage lender which engaged in, and the activities of which affected, interstate commerce. ABC was the wholesale division of American Home Mortgage Investment Corporation. ABC filed for bankruptcy in August 2007.

93. American Home Mortgage Investment Corporation ("AHM") was a mortgage lender which engaged in, and the activities of which affected, interstate commerce. AHM filed for bankruptcy in August 2007.

94. Bank of America was a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"), and which engaged in, and the activities of which affected, interstate commerce.

95. Cache Valley Bank was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

96. CitiFinancial was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

97. Coastal Federal Credit Union was a mortgage lender and loan provider, the deposits of which were insured by the National Credit Union Association, and which engaged in, and the activities of which affected, interstate commerce.

11

98. Fifth Third Home Mortgage Company was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

99. First Federal Bank was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

100. IndyMac Bank was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce. In July 2008, IndyMac Bank failed and was placed into conservatorship by the FDIC.

101. JP Morgan Chase Bank, N.A. was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

102. National City Bank was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

103. Pentagon Federal Credit Union was a mortgage lender and loan provider, the deposits of which were insured by the National Credit Union Association, and which engaged in, and the activities of which affected, interstate commerce.

104. RBC Centura was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

105. Sutton Bank was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

106. Washington Mutual was a financial institution the deposits of which were insured by FDIC, and which engaged in, and the activities of which affected, interstate commerce. In September 2008, the Office of Thrift Supervision seized Washington Mutual.

107. Wells Fargo Home Mortgage was a financial institution the deposits of which were insured by the FDIC, and which engaged in, and the activities of which affected, interstate commerce.

## V.  THE MEANS AND METHODS OF THE ENTERPRISE

108. Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the Enterprise were the following:

a. Members of the Enterprise and their associates committed, conspired to commit, and aided and abetted in the commission of investment fraud, including securities fraud, which affected interstate commerce, to enrich their personal finances and the

12

finances of their co-conspirators and associates and to expand the Enterprise's criminal operations;

b.　Members of the Enterprise and their associates committed, conspired to commit, and aided and abetted in the commission of mortgage fraud, which affected interstate commerce, to enrich their personal finances and the finances of their co-conspirators and associates and to expand the Enterprise's criminal operations;

c.　Members of the Enterprise and their associates committed, conspired to commit, and aided and abetted in the commission of bank fraud, which affected interstate commerce, to enrich their personal finances and the finances of their co-conspirators and associates and to expand the Enterprise's criminal operations;

d.　Members of the Enterprise and their associates committed, conspired to commit, and aided and abetted in the commission of money laundering, which affected interstate commerce, to conceal their fraudulent activities and to conceal the true scope of their personal finances and the criminal operations of the Enterprise and to promote additional criminal acts of the Enterprise;

e.　Members of the Enterprise and their associates committed, conspired to commit, and aided and abetted in the commission of wire fraud, which affected interstate commerce, to facilitate the Enterprise's commission of mortgage fraud, bank fraud, and investment fraud and to enrich their personal finances and the finances of their co-conspirators and associates and to expand the Enterprise's criminal operations;

f.　Members of the Enterprise and their associates did knowingly combine, conspire, confederate and agree with each other, and others both known and unknown to the Grand Jury to possess with intent to distribute, and aid and abet in the commission of the possession with intent to distribute illegal drugs, including marijuana, a Schedule I controlled substance, to enrich their personal finances and the finances of their co-conspirators and associates and to expand the Enterprise's criminal operations;

g.　Members of the Enterprise and their associates committed, conspired to commit, and aided and abetted in the commission of the bribing of bank officials, which affected interstate commerce, to facilitate the Enterprise's commission of mortgage and bank fraud, and to enrich their personal finances and the finances of their co-conspirators and associates and to expand the Enterprise's criminal operations; and

h.　Members of the Enterprise committed perjury, to conceal their fraudulent activities and to conceal the true scope of their personal finances and the criminal operations of the Enterprise.

## VI.    THE PATTERN OF RACKETEERING ACTIVITY

109.    The pattern of racketeering activity consisted of multiple acts of securities fraud, mortgage fraud, bank fraud and money laundering, effectuated, in part, through use of the wires as well as conspiracy to distribute marijuana. The Enterprise also engaged in acts of bank bribery and perjury.

### A.    Acts of Investment and Securities Fraud

### (1)    The Investment and Securities Fraud Scheme Generally

110.    From in or about January 2007 through in or about February 2012, the Enterprise engaged in a series of investment fraud acts, including acts of securities fraud, by convincing individuals in Mecklenburg County, North Carolina, and elsewhere to invest in various sham corporations controlled by the Enterprise, including Brighton Developers, Sovereign Equity, Prestige, Global Motorist a/k/a Prestige Auto Body & Repair, Elite Automotive a/k/a Phil Ford Automotive, and related entities.

111.    The Enterprise's investment fraud operations were led by TYSON, HUNT, CARRIE TYSON, JAMES TYSON SR., and BARNES and others known and unknown to the Grand Jury and targeted professional athletes and doctors as well as their personal and professional acquaintances.

112.    The Enterprise induced victims to invest not just money that they had, but also, in instances where the victim did not have money to invest, to take loans out of financial institutions and sign those loan proceeds over to the Enterprise for purported investment.

113.    The Enterprise's investment fraud operations alone induced more than 50 investor victims to invest more than $27 million.

### (2)    Brighton Developers

114.    The Enterprise began its investment fraud activity in or about 2006. In its initial phase, the Enterprise solicited investments through a sham corporation, Brighton Developers, an entity also used by the Enterprise for its mortgage fraud activity, which TYSON, CARRIE TYSON, and HUNT owned and controlled for the Enterprise.

115.    In general, for the Brighton Developers phase of the investment fraud scheme, members of the Enterprise would present the potential investor victim with a promissory note that would represent the amount of investment and the amount of return – generally either 75% or 100% of their initial investment – to be paid within ninety days, and would further represent in the promissory note that the investment was supposedly secured by a particular parcel, or lot, of real estate.

116. The Enterprise induced these victims to invest in Brighton Developers and enter into these promissory notes by making false and fraudulent representations, omitting material facts, and telling deceptive half-truths. Such misrepresentations generally, and at various times, included the following:

     a. That investor funds would be invested in a real estate project in Kannapolis, North Carolina, or in a real estate project in Bristol, Tennessee;

     b. That the investments would be secured by lots in the Fisher Lake Farm subdivision in Kannapolis, North Carolina, or lots in the Bristol Trace subdivision in Bristol, Tennessee; and

     c. That the investment opportunity promised a return on their principal investment plus, depending on the investor, either 75% or 100% interest within ninety days.

117. Further, to induce investment in Brighton Developers, the Enterprise would sometimes take potential investor victims to Kannapolis and show them the property that was purportedly to be developed. Other times the members of the Enterprise would show potential investor victims blueprints, plats, land development plans, and information about the purported land development project in Kannapolis.

118. In truth and fact, the Enterprise did not invest the investor victims' money in the purported land development project in Kannapolis or purported land development project in Bristol, Tennessee, but instead used the money for the benefit of the Enterprise, including:

     a. To fund the Enterprise's mortgage fraud transactions;

     b. To support the personal lifestyles of members of the Enterprise and their families by, for example, among other things, buying expensive cars, taking lavish trips, or throwing extravagant dinners and parties;

     c. To invest in other sham businesses of the Enterprise or other purported investments, without disclosing such purported change in investment to the investor victim; and

     d. To pay back portions of the investments made by others, in Ponzi-fashion.

15

119. Additionally, when the Enterprise had failed to return the money invested in Brighton Developers or make good on the promises of investment return, CARRIE TYSON began having regular teleconferences with disgruntled investor victims to explain the purported delay in paying them their returns, and in so doing, made additional false and fraudulent representations, omitted material facts and told deceptive half-truths. Such misrepresentations generally, and at various times, included the following:

    a.    That all was okay with Brighton Developers and the money was just being held up;

    b.    That Brighton Developers was expecting hundreds of thousands of dollars to come in any day from Hong Kong; and

    c.    That the lack of funds was caused by the bank.

120. For example, in or about March/April 2007, the Enterprise arranged to fly several professional athletes to Charlotte to hear a presentation regarding the purported investment opportunity with Brighton Developers. Among others, HUNT, CARRIE TYSON, TYSON, and JAMES TYSON SR. were present on behalf of the Enterprise.

121. The members of the Enterprise falsely represented to the investor victims that they would be investing in a real estate development project in Kannapolis, showing them plats and land development plans, and assuring them their investment would be secured by parcels, or lots, of real estate. Members of the Enterprise also took some of these potential investor victims to Kannapolis to show them the alleged property in which they supposedly would be investing.

122. Members of the Enterprise represented to these potential investor victims that they would receive their original investment, plus a 75% return, within ninety days. Each potential investor victim was given a promissory note, reflecting the amount that they had invested. For example,

    a.    B.J. was induced by the Enterprise to make a $150,000 investment on or about April 6, 2007, that the Enterprise represented in a March 31, 2007 promissory note was purportedly a loan to Brighton Developers secured by "Lot #17 at Fisher Lake Farm subdivision in Kannapolis North Carolina."

    b.    C.P. was induced to make a $200,000 investment on or about April 9, 2007 that the Enterprise represented in a promissory note was purportedly a loan to Brighton Developers secured by "Lot #8 at Fisher Lake Farm subdivision in Kannapolis North Carolina."

    c.    D.F. was induced to make a $200,000 investment on or about April 9, 2007, that the Enterprise represented in a promissory note was purportedly a loan to Brighton Developers secured by "Lot #30 at Fisher Lake Farm subdivision in Kannapolis North Carolina."

d.      S.M. was induced to make a $200,000 investment on or about April 10, 2007, that the Enterprise represented in a promissory note was a loan to Brighton Developers purportedly secured by "Lot #7 at Fisher Lake Farm subdivision in Kannapolis North Carolina."

e.      D. and S.L. were induced to make a $150,000 investment on or about April 17, 2007, that the Enterprise represented in a promissory note purportedly a loan to Brighton Developers secured by "Lot #31 at Fisher Lake Farm subdivision in Kannapolis North Carolina."

123.    While the Enterprise represented to these investor victims that their investment would be used for the project in Kannapolis, in truth and fact, the Enterprise used their investment for (1) funding the mortgage fraud scheme, discussed below, including to fund the down payment for the Enterprise's purchase of 9215 Woodhall Lake Drive, Waxhaw, North Carolina; (2) funding personal expenses of TYSON and other members of the Enterprise, including the purchase of a watercraft costing $18,868.84; and (3) making Ponzi payments to previous investors.

124.    The ninety day investment term passed and the investor victims had neither received the return of their principal nor their 75% interest payments. After the investors questioned HUNT and CARRIE TYSON regarding the investment, TYSON, CARRIE TYSON, and HUNT flew to Miami, Florida to meet with the investor victims and purportedly presented them with checks for their investment and investment returns.

125.    During the period of the conspiracy, TYSON, CARRIE TYSON and HUNT arrived at a party thrown by R.M. in Florida, and before providing the investor victims checks that were supposedly the sum of their investment and the return on their investment, the Enterprise tried to convince these investor victims to roll their investment over into another project, so that these checks would never be cashed. However, after the investor victims declined to reinvest their money, CARRIE TYSON gave them checks – totaling more than $1 million – that were purporting to represent their principal plus return on investment.

126.    But when the investor victims went to negotiate these checks with the banks, each of the checks bounced. Indeed, in truth and fact, at the time the checks were written by the Enterprise, the account had a negative balance.

127.    At that same party thrown by R.M. in Florida, another professional athlete (J.C.) and his wife (T.C.) were induced by the Enterprise to make an investment of $100,000 in Brighton Developers. On or about July 2, 2007, J.C. and T.C. did invest, via a cashier's check, which the Enterprise represented in a promissory note was purportedly a loan secured by "Lot #7 Bristol Trace a subdivision at Bristol, Tennessee." Like other professional athlete investor victims, J.C. and T.C. were promised a 75% return in ninety days.

128.    While the Enterprise represented to J.C. and T.C. that their investment would be used for real estate development in Bristol, Tennessee, in truth and fact, the Enterprise transferred

17

T.C. and J.C.'s investment into numerous different accounts used and maintained by the Enterprise and used it for, among other things, personal expenditures of members of the Enterprise.

129. The ninety days passed, and T.C. and J.C. received neither the return of their principal nor their 75% interest payments.

### (3) Sovereign Equity

130. As investor victims began demanding the return of their investment money and the Brighton Developers phase of the investment fraud scheme began to collapse, TYSON, HUNT, and BARNES created another sham corporation – Sovereign Equity – which they also owned and controlled for the Enterprise, so that they could continue fraudulently inducing investments to fund the operations and personal expenses of the Enterprise.

131. In general, for the Sovereign Equity phase of the investment fraud scheme, members of the Enterprise would present the potential investor victim with a Sovereign Equity Master Loan Agreement and related documents, which would represent the amount invested and a promise that the potential investor victim would receive a return of 15% per year, paid quarterly at 3.75% or "50% of net profits generated on a cash basis on a pro-rated share of the Lenders' Loan amount, paid monthly as profits are generated" and that such investment would only be for a one year term.

132. Investor victims were, in general, told that they would be investing in real estate, sports/entertainment, and/or business acquisitions. Investor victims further received a "Limited Transaction Authorization" which represented that money the investor victim invested would only be used "to enter into transactions as the Managers deem appropriate which they reasonably believe will provide a profit."

133. The Enterprise induced these individuals to invest in Sovereign Equity and enter into these Master Loan Agreements by making false and fraudulent representations, omitting material facts, and telling deceptive half-truths. Such misrepresentations generally, and at various times, included the following:

    a. That "Sovereign's number one priority is safety for investors and smart decisions to make investors profitable returns";

    b. That the money provided by investors would be invested "in a variety of business acquisitions of small assets to acquisitions of large assets, multi-asset companies and from stable assets to assets that require repositioning or extensive overhaul";

    c. That the investment funds would be used for real estate development, sports/entertainment, financial consulting and investments, and business acquisitions;

    d. That investors were buying stock in Sovereign Equity Group and would be shareholders of the company;

18

e.  That investors who invested $50,000 or more would receive monthly dividend payments; investors who invested between $20,000 and $49,999 would receive quarterly dividend payments and that investors who invested between $5,000 and $19,999 would receive annual dividends;

f.  In still other instances, the Enterprise told potential investors that dividend payments would be made twice a year to the investors;

g.  That investors would receive returns of 8 to 25%;

h.  That if investors took out loans and invested the proceeds with Sovereign Equity, the Enterprise would make all loan payments in addition to paying the investor dividends; and

i.  That the Board had over 25 years of experience in each division.

134.  In other instances, the Enterprise induced victims to invest in Sovereign Equity and enter into these Master Loan Agreements by representing that the victim was investing in a particular project supposedly managed by Sovereign Equity, again making false and fraudulent representations, omitted material facts, and told deceptive half-truths. Such misrepresentations generally, and at various times, included the following:

a.  That the money would be invested in a particular project, like the EPIC project, and would be leveraged in an escrow account for the real estate financing of that project; and

b.  That the principal investment would remain in the escrow account for one year and the investor would receive a 15% return on the investment.

135.  Additionally, when the Enterprise had failed to return the money invested in Sovereign Equity or make good on the promises of investment return, members of the Enterprise made additional false and fraudulent representations, omitted material facts and told deceptive half-truths. Such misrepresentations generally, and at various times, included the following:

a.  That everyone would be made whole by Thanksgiving of 2010;

b.  That Sovereign Equity would pay additional returns of 10 to 20% because the "T-strip investment" was being held up;

c.  That it would be better for tax purposes to wait to receive the investment until the following tax year;

d.  That the investor victim needed to form an LLC to receive the investment return; and

e.  That the money "was tied up" in securities in Europe.

136.  In truth and fact, the Enterprise did not invest the money for the purposes represented to investor victims, but instead used the money for the benefit of the Enterprise, including:

a.  To support the personal lifestyles of members of the Enterprise and their families by, for example, buying expensive cars, taking lavish trips, and throwing extravagant dinners and parties;

b.  To invest in other sham businesses of the Enterprise or other purported investments, without disclosing such purported change in investment to the investor victim; and

c.  To pay back portions of the investments made by others, in Ponzi-fashion.

137.  For example, in or about mid-2007, BARNES, CARRIE TYSON, TYSON and MCDOWELL induced M.F. to invest in various businesses associated with the Enterprise, telling her that they were involved in various real estate projects, and that she did not need cash to invest, so long as she had good credit.

138.  CARRIE TYSON and MCDOWELL then induced M.F. to sign a purported lease in the amount of $132,000 (for a piece of construction equipment) telling M.F. they would make all lease and insurance payments and pay her a monthly dividend.

139.  While the Enterprise initially made payments on the construction equipment, those payments ultimately ceased.  BARNES and HUNT then induced M.F. to invest in Sovereign Equity, telling her that it was an opportunity to help her get out of the debt with the construction equipment.  HUNT represented that Sovereign Equity was an investment company that involved doctors, lawyers, and athletes.

140.  Because M.F. did not have money to invest in Sovereign Equity at the time, HUNT induced her to obtain loans – totaling $40,000 – and to sign those loan proceeds over to Sovereign Equity.

141.  HUNT represented that Sovereign Equity would make the loan payments and M.F. would receive the principal and a 15% return.  Consistent with other victims, on or about September 4, 2008, TYSON and HUNT induced M.F. to sign a Master Loan Agreement, which likewise indicated that M.F. was investing $40,000 and would receive a return of 15% per year, paid quarterly at 3.75% or "50% of net profits generated on a cash basis on a pro-rated share of the Lenders' Loan amount, paid monthly as profits are generated."

142.  HUNT and TYSON then further induced M.F. to invest in their purported car dealership Phil Ford a/k/a Elite Automotive, telling M.F. that it was the only way for her to get out

20

of the construction equipment debt and to recover the losses from the loans she obtained to invest in Sovereign Equity.

143. HUNT then, unbeknownst to M.F., opened a credit card in M.F.'s name, which HUNT and BARNES then used for their benefit.

144. TYSON and HUNT then arranged for M.F. to open an account at Navy Federal Credit Union and to obtain a $59,000 loan, the proceeds of which M.F. was induced to sign over to the Enterprise for investment in Phil Ford a/k/a Elite Automotive.

145. While the Enterprise represented that the loan proceeds would be used for business purposes, in truth and fact, the investment money provided by M.F. for Sovereign Equity and Phil Ford a/k/a Elite Automotive was actually used for, among other things, paying for personal expenses of members of the Enterprise.

146. While the Enterprise initially made loan payments on the Navy Federal Credit Union loan, the Enterprise's payment of that loan, like its payments on the loan for the construction equipment and the loans M.F. took out to invest in Sovereign Equity, ceased.

147. The term of the Master Loan Agreement likewise came and went without M.F. receiving either her principal or promised 15% interest.

148. In another example, in or about mid-2008, C.B. attended a meeting at a new hotel in Southpark to learn about Sovereign Equity. At this meeting HUNT and TYSON explained to C.B. that to invest in Sovereign Equity she would take out loans and then sign the loan proceeds over to Sovereign Equity, for which she would earn a return on her investment.

149. HUNT and TYSON induced C.B. to take loans out of financial institutions and turn those loan proceeds over to Sovereign Equity, telling her that if she took out $50,000 in loans to invest in Sovereign Equity that she would receive money to make her loan payments, as well as dividend payments, and that the more she invested the more she would receive. They further represented to C.B. that her money would be invested in real estate.

150. C.B. was then introduced to Marcia Williams at another Sovereign Equity meeting, at which point Marcia Williams offered to take care of the loan applications. C.B. provided her personal information to Marcia Williams, but never signed loan applications or was present when loan applications were submitted.

151. Beginning in June 2008 and shortly thereafter, C.B. received checks from various banks, obtaining, in total, $121,000 in loans, and thereafter signed all the loan proceeds over as purported investments in Sovereign Equity. On or around July 11, 2008, she received a Master Loan Agreement indicating an investment of $116,500 and promised a return of 15% per year, paid quarterly at 3.75% or "50% of net profits generated on a cash basis on a pro-rated share of the Lenders' Loan amount, paid monthly as profits are generated, whichever is greater" and that the term of the loan was one year.

152. Additionally, while C.B. was told her money would be invested in real estate and the Limited Transaction Authorization represented that her money would only be used "to enter into transactions as the Managers deem appropriate which they reasonably believe will provide a profit", in truth and fact, the investment money provided by C.B. was used to invest in neither real estate nor any potentially profitable investment.

153. C.B. did not receive her dividend payments as promised, a year came and went, and she did not receive the return of her investment, as promised. The Enterprise eventually stopped making payments on C.B.'s loans.

154. In or about March 2010, HUNT and JONES induced B.B. to invest $3.7 million in Sovereign Equity, promising B.B. that his money would be held in a separate account and would never be at risk. HUNT and JONES further promised B.B. a return of $21.7 million within a week, such profit to be split between Sovereign Equity and B.B.

155. On or about March 1, 2010, B.B. wired $3.7 million to the Sovereign Equity account.

156. While it was represented to B.B. that his money was being invested in Sovereign Equity and that it would be held in a separate account and not at risk, in truth and fact, B.B.'s money was divided and wired to numerous different accounts, and was used by the Enterprise for various unauthorized purposes, such as making Ponzi payments to other investor victims and operational expenses of the Enterprise.

### (4) **Prestige**

157. When the Sovereign Equity phase of the investment fraud scheme started to collapse, in order to continue the activities of the Enterprise, TYSON, HUNT, and HUNTER used B.B.'s $3.7 million investment in Sovereign Equity to create a third sham corporation – Prestige – which they also owned and controlled for the Enterprise.

158. The Enterprise then induced further investments in Prestige by making false and fraudulent representations, omitting material facts, and telling deceptive half-truths. Such misrepresentations generally, and at various times, included the following:

a. That HUNT had eleven years of relevant experience, including experience as co-founder of Sovereign Equity Group, which supposedly lent non-controlling capital to middle-market companies to finance acquisitions, buyouts, expansions and recapitalizations;

b. That HUNTER had seventeen years of relevant experience, including experience as co-founder of D2W Capital Management LLC, a managed currency fund provider, which was purportedly consistently ranked in the top 10 for currency traders for Barclay Hedge's Ranking, and had successfully managed currency portfolios since the late 1990's;

22

c. That, with regard to athletes and entertainers – Prestige's targeted audience - Prestige understood the need for a trusted advisor because it understood that those clients may have previously been the victim of misplaced trust, poor investment advice, or hidden agendas;

d. That the Multi-Strategy Fund was formed for the purpose of pooling participant's funds to invest in, among other things, "spot currencies, precious metals, other commodities, index options, future contracts, and various other financial instruments and asset classes;" and

e. That "[a]ll funds invested in the [Muti-Strategy Fund] by [the Multi-Strategy participants] will be held in the [Multi-Strategy Fund and] will not commingle its funds with any other party."

159. Additionally, to induce investment in the Multi-Strategy fund, Prestige also posted, on the BarclayHedge website, returns supposedly earned by the Multi-Strategy Fund, when, in truth and fact, the returns posted were false.

160. Likewise, Prestige sent false account statements to Multi-Strategy Fund participants and posted false return information on Prestige's website.

161. In truth and fact, of the approximate $4.65 million invested with the Prestige phase of the investment fraud scheme, the Enterprise stole $550,000 off the top, depositing that money directly into Prestige's bank account, rather than an account in the name of the Multi-Strategy Fund.

162. Of the remaining approximate $4.1 million, the Enterprise subsequently withdrew approximately $2.25 million from the Multi-Strategy Fund and deposited it into various bank accounts in Prestige's name.

163. Indeed, of the approximate $4.65 million, only a fraction actually was traded, and only approximately $84,000 was returned to the investor victims.

164. For example, in or about November and December 2010, HUNTER and HUNT, among others, induced M.T. to invest $4 million of his company's money in Prestige Multi Strategy Fund, promising M.T. that if the market value of the Securities Account fell below $3,975,000 that Prestige would immediately liquidate the Account and remit the proceeds to M.T.'s company.

165. Further, the agreement between Prestige and M.T. expressly limited the investments that were permitted to be made and required Prestige to provide timely true and correct copies of all statements and confirmations of the account.

166. Prestige purported to pay M.T. interest and fees, and provided him statements purportedly demonstrating that the balance was above the minimum threshold required by the

23

agreement. In truth and fact, any interest and fees paid to M.T. were Ponzi payments, and the statements were bogus statements created by Prestige.

167. While the Agreement specifically limited how much could be invested and where it could be invested, in truth and fact, the majority of M.T.'s money was stolen from the Multi Strategy Fund and deposited into other bank accounts controlled by Prestige.

168. At the end of the term of the Agreement, M.T. sought to have his money returned, only to learn that – notwithstanding the statements he had been shown – the money was no longer there.

**(5)** **Global Motorist and Elite Automotive a/k/a Phil Ford Automotive**

169. During this time, the Enterprise also purported to run car dealerships, including Global Motorist, a/k/a Prestige Auto Body and Repair, and Elite Automotive, a/k/a Phil Ford Automotive, all of which were controlled primarily by TYSON, HUNT, MCDOWELL, JAMES TYSON SR., and BARNES for the Enterprise.

170. In many instances, the Enterprise would use Global Motorist and Elite Automotive to induce existing victims of the investment fraud scheme to take loans out of financial institutions and sign that money over to the Enterprise, making additional false and fraudulent representations, omitting material facts, and telling deceptive half-truths to those existing victims. Such misrepresentations generally, and at various times, included the following:

    a. That the investor would receive a guaranteed monthly return on his or her investment;

    b. That if the investor took out a loan and signed the proceeds over to Global Motorist or Elite Automotive, the Enterprise would make all loan payments for the investor;

    c. That the loans were personal loans, not car loans, but nonetheless would be secured by cars;

    d. That credit cards taken out in the investors names' would be used for business purchases, including to purchase vehicles; and

    e. That the Enterprise would make the credit card payments for the investor.

171. In truth and fact, the majority of the loans were actually to purchase cars, which the Enterprise rarely provided to the individuals who, unbeknownst to them, had actually paid for them. Likewise the Enterprise rarely attempted to sell the cars as falsely promised. Instead, in truth and fact, members of the Enterprise used the luxury cars for their personal benefit and as a show of wealth in an effort to induce victims to invest in their various sham corporations.

172. For example, in or about September 2008, M.W. and O.W. attended a meeting at Sovereign Equity's offices, at which meeting HUNT and TYSON made a presentation about investing in Sovereign Equity, and in particular, highlighting various real estate projects in which the potential investor victims money would supposedly be invested. TYSON and HUNT represented that the investment was a year-long investment, which would earn between 8% and 20%.

173. Induced by the Enterprise's representations, M.W. and O.W. signed a Master Loan Agreement, dated September 24, 2008, indicating their investment of $20,000. As with other investor victims, the Master Loan Agreement promised a return of 15% per year, paid quarterly at 3.75% or "50% of net profits generated on a cash basis on a pro-rated share of the Lenders' Loan amount, paid monthly as profits are generated, whichever is greater" and that the term of the loan was one year.

174. In or about October 29, 2008, M.W. and O.W invested an additional $15,000 in Sovereign Equity for a total investment of $35,000.

175. Throughout the coming year, HUNT lied to M.W. about how profitable her investment was, suggesting at one point that M.W. would receive an 8% return and at another point that the return would be as high as 20%. When M. W. was supposed to receive her dividend payments, HUNT convinced her to roll those payments back into her investment.

176. The year passed and it came time for M.W. to collect the return of her investment. HUNT made various misrepresentations as to why the investment could not be paid out, including purported tax consequences suggesting that M.W. needed to form an LLC to receive her investment return. As a result, M.W. was induced by HUNT to let HUNT create an LLC in M.W.'s name. HUNT then directed M.W. to open a bank account in the name of the LLC, which the Enterprise then misappropriated for its own purposes.

177. Also in or about late 2009 and continuing through 2010, HUNT and TYSON induced M.W. and O.W. to invest in their purported used car sales business. HUNT represented to M.W. that she could become a part owner in Elite Automotive, telling her that if she invested she would be guaranteed approximately $1,500 per month and she would only need to refer buyers to the car business.

178. HUNT and TYSON further represented that if M.W. and O.W. obtained loans and signed those loan proceeds over to invest in the car dealerships, that HUNT and TYSON would make all of the loan payments in addition to paying them monthly returns for their investment.

179. Induced by these representations, M.W. and O.W. obtained six different loans in or about late 2009 through early 2010, totaling approximately $260,000. While M.W. and O.W. thought they were obtaining loans secured by cars, in truth and fact, in all but one of these instances, HUNT and TYSON had arranged for M.W. and O.W. to obtain loans to purchase cars, without providing the cars to M.W. and O.W.

180. Additionally, HUNT represented to M.W. and O.W. that as part owners of the car dealerships, they should have company American Express cards, representing to them that they would not be liable for the charges and the cards only would be used for business purposes. In truth and fact, HUNT, TYSON, and others ran up a bill of more than $80,000 on the American Express cards, including numerous charges for their own personal benefit.

181. While TYSON and HUNT initially made some loan payments and some payments on the American Express credit cards, those payments eventually ceased.

### (6) Additional Acts of Investment Fraud

182. The Enterprise fraudulently solicited further investments from victims using still other sham corporations.

183. The Enterprise used New Century Homes of the Carolinas to induce victims to invest money using fraudulently obtained loans.

a. BUMPERS and other members of the Enterprise, in the name of New Century Homes of the Carolinas, induced some investor victims to take loans out of financial institutions and sign those loan proceeds over to the Enterprise.

b. To induce the victims to participate, the Enterprise made false and fraudulent representations, omitted material facts, and told deceptive half-truths to those victims, including that those victims were leasing or purchasing construction equipment and that the Enterprise would make all lease or loan payments for the victim.

c. In truth and fact, the Enterprise took the equipment, to the extent such equipment existed, and left the victims with tens of thousands and sometimes hundreds of thousands of dollars in loans.

184. The Enterprise used Inspiron in much the same way to induce victims to invest money using fraudulently obtained loans.

a. For example, on behalf of the Enterprise, and using Inspiron, BARNES induced E.E. to take tens of thousands of dollars of loans from financial institutions.

b. BARNES then induced E.E. to sign those loan proceeds over to the Enterprise by making false and fraudulent representations, omitting material facts, and telling deceptive half-truths, including that BARNES would serve as a broker and ensure that E.E. did not lose her money.

c. BARNES further represented that if E.E. would provide some of the money needed to purchase the company she and her acquaintances wanted to buy, BARNES' brother, TYSON, would then provide the rest of the money needed for that purchase, as an investment.

26

d.      In inducing this fraudulent investment, BARNES induced E.E. to sign a Master Loan Agreement similar to those used by the Enterprise when fraudulently inducing investments in Sovereign Equity, another sham corporation of which BARNES was an owner and principle.

e.      When the Enterprise failed to provide the promised funding and failed to return the money from E.E., BARNES made additional false and fraudulent representations, omitted material facts and told deceptive half-truths, including that the money was still there but had been transferred to another account, that the deal was still in the works but just delayed and that she would provide an accounting ledger for all monies invested by E.E.

f.      In truth and fact, like with other investor victims, the Enterprise initially made some loan payments, but those payments ultimately ceased, and the money was never invested as promised or returned to the investor victim.

185.    The Enterprise also used its investment fraud operations to coerce some investment fraud victims into serving as straw buyers for its mortgage fraud operations.

a.      For example, AMINI convinced F.B. to invest money she had saved for retirement into his truck leasing business, falsely promising that F.B. would receive a monthly guaranteed return.

b.      F.B., an elderly retired school teacher, agreed to invest.

c.      For her to invest, AMINI claimed that he needed her personal identifying information, such as her social security number.  F.B. agreed.

d.      ~~AMINI did not pay the promised return.~~

e.      Worse, AMINI used F.B.'s personal identifying information to obtain a credit card and various lines of credit, and then used that credit for his benefit.

f.      AMINI then coerced F.B. into serving as a buyer for the Enterprise's mortgage fraud operations, as set forth below, by intimidating F.B. and telling F.B. it was the only way to pay the debt now in her name.

**B.      Mortgage Fraud**

**(1)      The Mortgage Fraud Scheme Generally**

186.    From in or about March 2005 through in or about August 2007, the Enterprise committed multiple acts of mortgage fraud in and around Union and Mecklenburg Counties in North Carolina, primarily targeting the neighborhoods of Providence Downs South, Woodhall, Chatelaine, Skyecroft, Firethorne, Piper Glen, and Stratford on Providence.

187. The mortgage fraud scheme conducted by the Enterprise generally operated in the following manner:

    a. The Enterprise, generally through a promoter, would agree with a builder or owner to purchase a property at a set price (the "true price");

    b. The Enterprise would then arrange for a buyer to purchase the property at an inflated price, which was usually between $200,000 and $800,000 above the true price;

    c. In most circumstances, the buyer would agree to purchase the property in his or her own name and sign whatever documents were necessary in exchange for a hidden kickback.

    d. The builder would sell the property at the inflated price;

    e. The lender would make a mortgage loan on the basis of the inflated price; and

    f. The difference between the inflated price and the true price would be extracted at closing and distributed among members of the Enterprise.

188. To induce lenders to make mortgage loans, some participants of the Enterprise caused loan packages to be prepared and submitted to lenders that contained false and fraudulent representations and half-truths, and omitted or concealed material facts. Indeed, some loan packages at various times during the course of the scheme:

    a. Failed to disclose the true, agreed-upon price;

    b. Misrepresented the buyer's intent to occupy the home as their primary residence;

    c. Misrepresented the buyer's income or assets;

    d. Misrepresented the buyer's place of employment; and/or

    e. Contained false or forged documents.

189. The HUD-1 Settlement Statements associated with such loan packages and real estate closings contained false and fraudulent representations, half-truths, and omitted or concealed material facts. Indeed, some HUD-1 Settlement Statements at various times during the course of the scheme:

    a. Failed to disclose the true agreed upon price;

    b. Falsely stated that the buyer had provided cash at closing when the buyer had not provided cash at closing or would be reimbursed for same;

c. Fraudulently listed payments to entities controlled by members of the Enterprise as though such payments were to entities that had financed the building of or had assisted the builder in building the house;

d. Failed to accurately disclose the true disbursement of the mortgage loan proceeds; and/or

e. Failed to disclose that the buyer would directly or indirectly receive a portion of the mortgage loan proceeds.

190. The closing attorneys received into their trust accounts the proceeds of the fraud and distributed such proceeds to members of the Enterprise.

a. Typically, the Enterprise caused the closing attorneys to distribute such proceeds to bank accounts in the names of entities controlled by members of the Enterprise in order to conceal the ownership and control of such mortgage fraud proceeds, as well as to disguise the true recipients of such funds; and

b. When the proceeds of the mortgage fraud were distributed to the buyers as kickbacks, the members of the Enterprise usually would first funnel the kickback through an entity controlled by the Enterprise to conceal the true source of the kickback, as well as to conceal the fact that the buyer often would receive, own, and control some of the proceeds of the fraud.

### (2) March 28, 2005: Activity Related to 2131 Rolston Drive, Charlotte

191. On or about March 28, 2005, the Enterprise fraudulently purchased 2131 Rolston Drive, Charlotte, North Carolina, in the name of A.M. for an inflated price of $1,690,000, fraudulently obtaining loan proceeds totaling approximately $1,500,000.

192. AMINI, Panayoton (A.M.'s daughter) and other members of the Enterprise caused the loan package for A.M.'s purchase of 2131 Rolston Drive, Charlotte, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That A.M. would live at 2131 Rolston Drive, Charlotte, North Carolina, as his primary residence when, in truth and fact, A.M. had no such intention and never moved into the property;

b. That A.M. had worked at CGC for ten years, when, in truth and fact, he had never worked at CGC;

c. That A.M. had a monthly income of $42,500, when in truth and fact, A.M.'s monthly income was approximately $4,500 per month – more than $450,000 less than the annual income fraudulently stated;

d.      That A.M. had assets totaling over $1,900,000, including $225,000 in a Bank of America account, when, in truth and fact, A.M. did not have such assets, and did not have $225,000 in that Bank of America account;

e.      That A.M. had paid a cash deposit on the sales contract of $2,000, when, in truth and fact, A.M. had paid no such deposit;

f.      That A.M. would pay cash at closing, when, in truth and fact, A.M. had no such intention of paying cash at closing and did not;

g.      That A.M. had provided the information in the loan application via a phone interview, when, in truth and fact, A.M. had never spoken with anyone in person or on the telephone about his loan application; and

h.      That A.M. had signed the purchase contract, when, in truth and fact, he had not.

193.    AMINI, Panayoton and other members of the Enterprise caused the HUD-1 Settlement Statement for A.M.'s purchase of 2131 Rolston Drive, Charlotte to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a.      Failed to disclose the true agreed upon price;

b.      Falsely stated that A.M. provided an earnest money deposit of $2,000, when, in truth and fact, A.M. provided no such earnest money deposit;

c.      Falsely stated that A.M. provided $185,240.94 cash at closing, when, in truth and fact, A.M. provided no cash at closing. Instead, Panayoton provided A.M.'s down payment funds, with $33,000 cash and the rest from the checking account for her business, CGC. AMINI then disbursed to Panayoton fraudulent proceeds from the loan which covered the down payment;

d.      Fraudulently listed a $490,000 payment as a Lien to Ramin Amini, LLC, as if there was an existing lien on the property, when, in truth and fact, AMINI had no lien on the property, but was instead fraudulently receiving proceeds from the sale he arranged; and

e.      Failed to disclose a hidden kickback as set forth below.

194. Following the closing for 2131 Rolston Drive, Charlotte, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about March 30, 2005, AMINI distributed a hidden kickback from the mortgage fraud proceeds of $334,000 to Panayoton, via wire; and

b. On or about March 31, 2005, Panayoton further distributed $100,000 of the hidden kickback she had received from her account in the name of CareerSource to an account in the name of CGC, another company she controlled.

195. While A.M. was the supposed buyer and the loan documents represented that 2131 Rolston Drive, Charlotte, North Carolina, would be his primary residence, in truth and fact:

a. A.M. never lived there; instead, Panayoton moved into 2131 Rolston Drive, Charlotte, North Carolina, following the closing and lived there until the house was resold by the Enterprise on December 13, 2006; and

b. A.M. never made mortgage payments on 2131 Rolston Drive, Charlotte, North Carolina; instead, any mortgage payments were made, at most, by Panayoton on behalf of the Enterprise, prior to the Enterprise reselling the house.

196. As discussed in more detail below, a year and a half later (on December 13, 2006), the Enterprise resold 2131 Rolston Drive, Charlotte, North Carolina, for a yet further inflated purchase price.

**(3)     August 30, 2006:  Activity Related to 6800 Linkside Court, Charlotte**

197. On or about August 30, 2006, the Enterprise fraudulently purchased 6800 Linkside Court, Charlotte, North Carolina, in the name of Mary Vaughn for an inflated price of $1,400,000, fraudulently obtaining loan proceeds totaling $1,398,739.66.

198. TYSON, WOOD, Danielle Vaughn, Goodson-Hudson, Mary Vaughn and other members of the Enterprise caused the loan package for Mary Vaughn's purchase of 6800 Linkside Court, Charlotte, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That Mary Vaughn would live at 6800 Linkside Court, Charlotte, North Carolina, as her primary residence, when, in truth and fact, Mary Vaughn had no such intention and never moved into the property; and

b. That Mary Vaughn was self-employed, when, in truth and fact, she was unemployed.

199.   TYSON, WOOD, Danielle Vaughn, Goodson-Hudson, Mary Vaughn, Kelvis Smith and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for Mary Vaughn's purchase of 6800 Linkside Court, Charlotte, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a.   Failed to disclose the true agreed upon price;

b.   Fraudulently listed $420,199.43 as cash due to seller as though the entirety of this payment was paid to the seller, when, in truth and fact, such proceeds were divided up in a manner designed to conceal the fraud; and

c.   Failed to disclose hidden kickbacks as set forth below.

200.   Following the closing for 6800 Linkside Court, Charlotte, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a.   On or about August 31, 2006, Kelvis Smith distributed a hidden kickback of $276,902 from the mortgage fraud proceeds to Brighton Developers;

b.   On or about August 31, 2006, Kelvis Smith distributed a hidden kickback of $25,000 from the mortgage fraud proceeds to McPhaul via check; and

c.   On or about September 5, 2006, TYSON paid a $5,000 kickback to Mary Vaughn for purchasing 6800 Linkside Court, Charlotte, North Carolina.

201.   While Mary Vaughn was the buyer and represented that 6800 Linkside Court, Charlotte, North Carolina, would be her primary residence, in truth and fact:

a.   Mary Vaughn never lived there; instead, other members of the Enterprise, including CARRIE TYSON and WOOD, moved into the property at 6800 Linkside Court, Charlotte, North Carolina; and

b.   Mary Vaughn never made mortgage payments; instead, when mortgage payments were made, they were made by Brighton Developers, on behalf of the Enterprise.

202.   The Enterprise let the loan payments lapse, and 6800 Linkside Court, Charlotte, North Carolina, fell into foreclosure. The property resold after foreclosure for $410,000 – $990,000 less than the inflated purchase price.

**(4) August 30, 2006: Activity Related to 2318 La Maison Drive, Charlotte**

203. On or about August 30, 2006, the Enterprise fraudulently purchased 2318 La Maison Drive, Charlotte, North Carolina, in the name of N.M. for an inflated price of $1,200,000, fraudulently obtaining loan proceeds totaling $1,158,909.67.

204. AMINI, Goodson-Hudson, Davis, THOROGOOD and other members of the Enterprise caused the loan package for N.M.'s purchase of 2318 La Maison Drive, Charlotte, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

    a.    That N.M. would live at 2318 La Maison Drive, Charlotte, North Carolina, as her primary residence when, in truth and fact, N.M. had no such intention and never moved into the property;

    b.    That N.M. would pay cash at closing when, in truth and fact, N.M. had no such intention of paying cash at closing and did not; and

    c.    That N.M. had been interviewed by Goodson-Hudson when, in truth and fact, N.M. had never spoken with Goodson-Hudson.

205. AMINI, Goodson-Hudson, Davis, THOROGOOD and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for N.M.'s purchase of 2318 La Maison Drive, Charlotte, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

    a.    Failed to disclose the true agreed upon price;

    b.    Falsely stated that N.M. had provided cash at closing of $33,133.41, when, in truth and fact, N.M. had provided no cash at closing; rather the down payment was netted out of the proceeds to AMINI, the seller;

    c.    Fraudulently listed $372,349.37 as cash due to seller as though the entirety of this payment was paid to the seller, when, in truth an fact, such proceeds were divided up in a manner designed to conceal the fraud; and

    d.    Failed to disclose hidden kickbacks as set forth below.

206. Following the closing for 2318 La Maison Drive, Charlotte, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

    a.    On or about August 28, 2006, AMINI directed Settlement Source to distribute a hidden kickback of $100,000 from the mortgage fraud proceeds to ProBowl

Brokerage LLC, Davis' company. On or about August 31, 2006, such proceeds were wired to ProBowl Brokerage consistent with AMINI's directions;

b. On or about October 10, 2006, Davis distributed a hidden kickback of $30,000 from the mortgage fraud proceeds to N.M./NT & Associates, via certified check; and

c. While the HUD-1 represented that $273,349.37 was paid to AMINI as the seller of 2318 La Maison Drive, Charlotte, North Carolina, on or about August 31, 2006 Settlement Source distributed, via wire, $140,215.96 to AMINI, such amount reflecting his proceeds, after paying ProBowl Brokerage the $33,133.41 falsely represented as having been provided by N.M. as cash at closing.

207. While N.M. was the buyer and the loan documents represented that 2318 La Maison Drive, Charlotte, North Carolina, would be her primary residence, in truth and fact:

a. N.M. never lived there; and

b. While N.M. initially made some mortgage payments, eventually TYSON took over making mortgage payments on N.M.'s behalf prior to the property going into foreclosure.

208. The Enterprise let the loan payments lapse, and 2318 La Maison Drive, Charlotte, North Carolina, fell into foreclosure. The property resold after foreclosure for $550,000 – $650,000 less than the inflated purchase price.

**(5) September 29, 2006: Activity Related to 6510 Pembry Links Circle, Charlotte**

209. On or about September 29, 2006, the Enterprise fraudulently purchased 6510 Pembry Links, Charlotte, North Carolina, in the name of F.B. for an inflated price of $1,057,000, fraudulently obtaining loan proceeds totaling $1,056,579.86.

210. AMINI, MITCHELL, Pasut, Mahaney and other members of the Enterprise caused the loan package for F.B.'s purchase of 6510 Pembry Links Circle, Charlotte, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That F.B. would live at 6510 Pembry Links Circle, Charlotte, North Carolina, as her primary residence when, in truth and fact, F.B. had no such intention and never moved into the property;

b. That F.B. had monthly income of 33,000, when, in truth and fact, F.B.'s monthly income as a retired person was approximately $12,000 – more than $250,000 less than the annual income fraudulently stated;

c. That F.B. had assets totaling over $2 million, when, in truth and fact, F.B. did not have assets totaling over $2 million;

d. That F.B. had over $1,500,000 on deposit with Wachovia supported by false verifications of deposit, when, in truth and fact, F.B only had approximately $100,000; and

e. That F.B. had paid a cash deposit on the sales contract of $5,000, when, in truth and fact, F.B. had paid no such deposit, but, rather, AMINI had provided the earnest money deposit of $5,000 in the form of a check from his company Camron Transportation,

211. AMINI, MITCHELL, Pasut, Mahaney and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for F.B.'s purchase of 6510 Pembry Links Circle, Charlotte, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a. Failed to disclose the true agreed upon price;

b. Falsely stated that F.B. had provided an earnest money deposit of $5,000, when, in truth and fact, AMINI had provided the earnest money deposit of $5,000 in the form of a check from his company Camron Transportation;

c. Falsely stated that F.B. had provided cash at closing of $4,375.20, when, in truth and fact, F.B. had provided no such cash at closing;

d. Fraudulently listed a commission paid at settlement of $26,350 as though the entirety of this payment would go to the agent, when, in truth and fact, such proceeds were divided up in a manner designed to conceal the fraud; and

e. Failed to disclose hidden kickbacks as set forth below.

212. Following the closing for 6510 Pembry Links, Charlotte, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about October 4, 2006, Pasut distributed a hidden kickback of $10,000 from the mortgage fraud proceeds to Amini, via check; and

b. On or about October 6, 2006, AMINI distributed a hidden kickback of $5,000 from the mortgage fraud proceeds to Mahaney via check.

213. While F.B. was the buyer and the loan documents represented that 6510 Pembry Links Circle, Charlotte, North Carolina, would be her primary residence, in truth and fact:

a. F.B. never lived there; instead, MITCHELL moved into 6510 Pembry Links Circle, Charlotte, North Carolina, after the closing; and

b.     F.B. never made mortgage payments on 6510 Pembry Links Circle, Charlotte, North Carolina; instead, to the extent they were made, they were made by the Enterprise.

**(6)     December 7, 2006:     Activity Related to 6510 Pembry Links Circle, Charlotte**

214.     Less than three months later, on or about December 7, 2006, the Enterprise fraudulently flipped 6510 Pembry Links Circle, Charlotte, North Carolina, to Moore for a yet further inflated price of $1,260,000, fraudulently obtaining loan proceeds totaling $1,196,747.

215.     AMINI, Mahaney, Osborne, Moore and other members of the Enterprise caused the loan package for Moore's purchase of 6510 Pembry Links Circle, Charlotte, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a.     That Moore would live at 6510 Pembry Links Circle, Charlotte, North Carolina, as his primary residence when, in truth and fact, Moore had no such intention and never moved into the property;

b.     That Moore had monthly income of over $37,000, when, in truth and fact, Moore's monthly income was approximately $10,500 – more than $315,000 less than the annual income fraudulently stated;

c.     That Moore had assets totaling over $1,100,000, including $615,000 in a Wachovia account, when, in truth and fact, he did not; and

d.     That Moore would pay cash at closing, when, in truth and fact, Moore had no such intention of paying cash at closing and did not.

216.     AMINI, TYSON, Mahaney, THOROGOOD, Osborne, Moore and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for Moore's purchase of 6510 Pembry Links, Charlotte, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a.     Failed to disclose the true agreed upon price;

b.     Falsely stated that Moore had provided an earnest money deposit of $5,000, when, in truth and fact, Moore had provided no earnest money deposit;

c.     Falsely stated that Moore had provided cash at closing of $59,331.95, when in truth and fact, Moore had provided no such cash at closing; rather, in truth and fact, the $59,331.95 cash at closing was provided by NT & Associates in the form of a cashier's check, for which NT & Associates was reimbursed by TYSON, through two transfers from Brighton Developers, following the closing;

d.     Fraudulently listed $142,468.90 as cash due to seller as though the entirety of this payment was paid to the seller, when, in truth an fact, such proceeds were divided up in a manner designed to conceal the fraud; and

e.     Failed to disclose a hidden kickback as set forth below.

217.   Following the closing for 6510 Pembry Links Circle, Charlotte, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a.     On or about December 11, 2006, a hidden kickback of $125,976.85 from the mortgage fraud proceeds were distributed to Brighton Developers.

218.   While Moore was the buyer and represented that 6510 Pembry Links Circle, Charlotte, North Carolina, would be his primary residence, in truth and fact:

a.     Moore did not move in after closing; and

b.     While Moore initially made mortgage payments on behalf of the Enterprise, those payments were later made by TYSON, on behalf of the Enterprise, prior to the property going into foreclosure.

219.   The Enterprise let the loan payments lapse, and 6510 Pembry Links, Charlotte, North Carolina, fell into foreclosure. The property resold after foreclosure for $980,000 – $280,000 less than the inflated purchase price.

### (7)   December 13, 2006:  Activity Related to 2131 Rolston Drive, Charlotte

220.   On or about December 13, 2006, the Enterprise fraudulently flipped 2131 Rolston Drive, Charlotte, North Carolina, to Moore for an inflated price of $2,100,000, fraudulently obtaining loan proceeds totaling $1,680,000.

221.   AMINI, TYSON, HUNT, Mahaney, Panayoton, Moore and other members of the Enterprise caused the loan package for Moore's purchase of 2131 Rolston Drive, Charlotte, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a.     That Moore would live at 2131 Rolston Drive, Charlotte, North Carolina, as his primary residence, when, in truth and fact, Moore had no such intention and never moved into the property;

b.     That Moore had monthly income of over $37,000, when, in truth and fact, Moore's monthly income was approximately $10,500 – more than $315,000 less than the annual income fraudulently stated;

c.    That Moore had assets totaling over $1,700,000, including three accounts at Wachovia totaling more than $725,000, when, in truth and fact, he did not. Rather, Taylor created a bogus verification of deposit supposedly from Wachovia Bank with a verification phone number controlled by Taylor;

d.    That Moore had paid a deposit by personal check of $5,000, when, in truth and fact, Moore had provided no earnest money deposit;

e.    That Moore would provide earnest money of $428,863.91, when, in truth and fact, Moore had no intention of providing such money; and

f.    That Moore would pay cash at closing, when, in truth and fact, Moore had no such intention of paying cash at closing and did not.

222.    AMINI, TYSON, HUNT, Mahaney, Panayoton, Phillip Wellington, Moore and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for Moore's purchase of 2131 Rolston Drive, Charlotte, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a.    Failed to disclose the true agreed upon price;

b.    Falsely stated that Moore had provided an earnest money deposit of $5,000, when, in truth and fact, Moore had provided no earnest money deposit;

c.    Falsely stated that Moore had provided cash at closing of $426,721.57, when, in truth and fact, Moore had provided no such cash at closing. Instead, in truth and fact, down payment checks were provided by a combination of (1) Network Imports in the amount of $44,000; (2) Brighton Developers in the amount of $112,000; (3) HUNT in the amount of $75,000; (4) Panayoton in the amount of $160,725; and (5) a wire from Phillip Wellington in the amount of $35,000;

d.    Fraudulently listed $488,527.78 as cash due to seller as though the entirety of this payment was paid to the seller, when, in truth an fact, such proceeds were divided in a manner designed to conceal the fraud, that is, the $488,527.78 cash due to seller was actually paid to Panayoton, for her participation in the scheme, parts of which she subsequently paid to other members of the Enterprise; and

e.    Failed to disclose hidden kickbacks as set forth below.

38

223. Following the closing for 2131 Rolston Drive, Charlotte, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about December 14, 2006, Panayoton further distributed $328,527.78 of the mortgage fraud proceeds that was represented as cash to seller in the following manner, none of which was disclosed on the HUD-1:

- A hidden kickback of $71,027.78 to Yasmin Construction, a company controlled by AMINI;

- A hidden kickback of $49,000 to Network Imports, a company controlled by M.D.;

- A hidden kickback of $20,000 to Camron Transportation, a company controlled by AMINI;

- A hidden kickback of $80,000 to CBIG, a company controlled by HUNT and TYSON;

- A hidden kickback of $70,000 to Brighton Developers; and

- A hidden kickback of $38,500 to Phillip Wellington.

b. On or about December 18, 2006, a hidden kickback of $319,693 to Brighton Developers.

224. While Moore was the buyer and represented that 2131 Rolston Drive, Charlotte, North Carolina, would be his primary residence, in truth and fact:

a. Moore never lived there; instead, the property was leased; and

b. While Moore initially made mortgage payments on behalf of the Enterprise, those payments were later made by TYSON, on behalf of the Enterprise, prior to the property going into foreclosure.

225. The Enterprise let the loan payments lapse, and 2131 Rolston Drive, Charlotte, North Carolina, fell into foreclosure. The property resold after foreclosure for $905,000 – over $1,195,000 less than the inflated purchase price.

### (8) Subsequent Distribution of Fraudulent Proceeds from 6510 Pembry Links Circle and 2131 Rolston Drive

226. Following the closings for 6510 Pembry Links Circle, Charlotte, North Carolina, and 2131 Rolston Drive, Charlotte, North Carolina, TYSON, for the Enterprise, further divided up

39

the fraudulent proceeds he had received from those closings in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about December 21, 2006, Brighton distributed a hidden kickback of $125,000 from the mortgage fraud proceeds to George Moore, the buyer, via his company, G. Moore Investments;

b. On or about December 21, 2006, Brighton distributed a hidden kickback of $60,000 from the mortgage fraud proceeds to AMINI; and

c. On or about December 21, 2006, Brighton distributed a hidden kickback of $15,000 from the mortgage fraud proceeds to WOOD.

### (9) January 4, 2007: Activity Related to 1040 Spyglass, Marvin

227. On or about January 4, 2007, the Enterprise fraudulently purchased 1040 Spyglass, Marvin, North Carolina, in the name of Mary Vaughn for an inflated price of $1,629,000, fraudulently obtaining loan proceeds totaling $1,535,596.16.

228. TYSON, Mahaney, Pasut, Sean Williams, Mary Vaughn and other members of the Enterprise caused the loan package for Mary Vaughn's purchase of 1040 Spyglass, Marvin, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That Mary Vaughn would live at 1040 Spyglass, Marvin, North Carolina, as her primary residence, when, in truth and fact, Mary Vaughn had no such intention and never moved into the property;

b. That Mary Vaughn was employed by STIR LLC, when in truth and fact, she was unemployed. Rather, to support that lie, Mary Vaughn created a bogus letter of employment and Sean Williams created a bogus verbal verification of employment;

c. That Mary Vaughn had monthly income of $38,000, when, in truth and fact, as noted, Mary Vaughn was unemployed;

d. That Mary Vaughn had assets totaling $800,000, including four Wachovia accounts with over $600,000 total on deposit, when, in truth and fact, Mary Vaughn did not have such funds on deposit. Rather, Taylor created a bogus verification of deposit supposedly from Wachovia Bank with a verification phone number controlled by Taylor;

e. That Mary Vaughn had made an earnest money deposit of $14,000, when, in truth and fact, Mary Vaughn had made no such earnest money deposit; and

f. That Mary Vaughn would pay cash at closing, when, in truth and fact, Mary Vaughn had no such intention of paying cash at closing, and did not.

229. AMINI, TYSON, Mahaney, Pasut, Sean Williams, Mary Vaughn and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for Mary Vaughn's purchase of 1040 Spyglass, Marvin, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a. Failed to disclose the true agreed upon price;

b. Falsely stated that Mary Vaughn had made an earnest money deposit of $14,000, when, in truth and fact, Mary Vaughn had made no such earnest money deposit; instead, when the initial earnest money deposit check from MITCHELL bounced, a $14,000 check was provided – on April 24, 2007, more than four months after closing – by Brighton Developers;

c. Falsely stated that Mary Vaughn had provided cash at closing of $79,316.53, when, in truth and fact, Mary Vaughn had provided no such cash at closing; rather, in truth and fact, down payment checks were provided by (1) TYSON, in the amount of $33,560; and (2) Network Imports in the amount of a $46,000; and

d. Fraudulently listed a commission payment of $93,000 (less $14,000 deposit supposedly retained) to the real estate agency that employed Pasut as though it was a commission payment for the real estate agent on the deal, when, in truth and fact, Pasut was paid this $79,000 for her participation in the scheme.

230. While Mary Vaughn was the buyer and represented that 1040 Spyglass, Marvin, North Carolina, would be her primary residence, in truth and fact:

a. Mary Vaughn never lived there; instead, TYSON, CARRIE TYSON, JAMES TYSON, SR., BARNES and various members of their family moved into 1040 Spyglass, Marvin, North Carolina, following the closing; and

b Mary Vaughn never made mortgage payments on 1040 Spyglass, Marvin, North Carolina; instead, mortgage payments, to the extent they were made, were made by TYSON on behalf of the Enterprise.

231. The Enterprise let the loan payments lapse, and 1040 Spyglass, Marvin, North Carolina, fell into foreclosure. The property resold after foreclosure for $1,115,000 – over $510,000 less than the inflated purchase price.

### (10) February 16, 2007: Activity Related to 606 Beauhaven Lane, Waxhaw

232. On or about February 16, 2007, the Enterprise fraudulently purchased 606 Beauhaven Lane, Waxhaw, North Carolina, in the name of F.B. for an inflated price of $995,000, fraudulently obtaining loan proceeds totaling $993,698.05.

233. AMINI, MITCHELL, Pasut, Mahaney, Osborne and other members of the Enterprise caused the loan package for F.B.'s purchase of 606 Beauhaven Lane, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That F.B. would live at 606 Beauhaven Lane, Waxhaw, North Carolina, as her primary residence, when, in truth and fact, F.B. had no such intention and never moved into the property;

b. That F.B. had assets over $3,300,000, including over $900,000 on deposit in various bank accounts, when, in truth and fact, F.B. did not;

c. That F.B. had paid a cash deposit on the sales contract of $2,000, when, in truth and fact, F.B. had paid no such deposit; and

d. That F.B. would pay cash at closing, when, in truth and fact, F.B. had no such intention of paying cash at closing and did not.

234. AMINI, MITCHELL, Pasut, Mahaney, Osborne and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for F.B.'s purchase of 606 Beauhaven Lane, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a. Failed to disclose the true agreed upon price;

b. Falsely stated that F.B. provided $2,238.30 cash at closing, when, in truth and fact, F.B. provided no cash at closing. Instead, Lace & Co., a company owned by MITCHELL, provided the down payment funds;

c. Fraudulently listed a $166,445.34 commission paid at settlement to the real estate agent as though the entirety of this commission would go to the real estate agent, when, in truth and fact, such proceeds were divided up in a manner designed to conceal the fraud; and

d. Failed to disclose hidden kickbacks.

235. Following the closing for 606 Beauhaven Lane, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about February 16, 2007, a hidden kickback of $151,445.34 from the mortgage fraud proceeds was distributed to Yasmin Construction, AMINI's company; and

b. On or about February 22, 2007, AMINI distributed a hidden kickback of $5,000 from the mortgage fraud proceeds to Mahaney.

236.     While F.B. was the buyer and the loan documents represented that 606 Beauhaven Lane, Waxhaw, North Carolina, would be her primary residence, in truth and fact:

a.     F.B. never lived there; instead, MITCHELL moved into 606 Beauhaven Lane, Waxhaw, North Carolina, following the closing and lived there until the house was flipped by the Enterprise on June 20, 2007; and

b     F.B. never made mortgage payments on 606 Beauhaven Lane, Waxhaw, North Carolina; instead, any mortgage payments were made, at most, by the Enterprise, prior to the Enterprise flipping the house.

237.     Approximately four months later, the Enterprise flipped 606 Beauhaven Lane, Waxhaw, North Carolina, for a yet further inflated purchase price, as discussed below.

### (11)  February 20, 2007:  Activity Related to 5020 Oxfordshire Road, Waxhaw

238.     On or about February 20, 2007, the Enterprise fraudulently purchased 5020 Oxfordshire Road, Waxhaw, North Carolina, in the name of F.B. for an inflated price of $2,000,000, fraudulently obtaining loan proceeds totaling $2,580,000.

239.     AMINI, MITCHELL, and other members of the Enterprise caused the loan package for F.B.'S purchase of 5020 Oxfordshire Road, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a.     That F.B. would live at 5020 Oxfordshire Road, Waxhaw, North Carolina, as her primary residence, when, in truth and fact, F.B. had no such intention and never moved into the property;

b.     That F.B. had monthly income of $36,000, when, in truth and fact, F.B.'s monthly income as a retired person was approximately $12,000 – more than $250,000 less than the annual income fraudulently stated;

c.     That F.B. had assets over $9,000,000, including over $5,500,000 on deposit in various bank accounts, when, in truth and fact, F.B. did not;

d.     That F.B. had paid a cash deposit on the sales contract of $5,000, when, in truth and fact, F.B. had paid no such deposit; and

e.     That F.B. would pay cash at closing, when, in truth and fact, F.B. had no such intention of paying cash at closing and did not.

240.     AMINI, MITCHELL, MEHR, Phillip Wellington and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for F.B.'s purchase of 5020

Oxfordshire Road, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a. Failed to disclose the true agreed upon price;

b. Falsely stated that F.B. provided an earnest money deposit of $5,000, when, in truth and fact, F.B. provided no such earnest money deposit;

c. Falsely stated that F.B. provided $395,721.52 cash at closing, when, in truth and fact, F.B. provided no cash at closing. Instead, F.B.'s down payment funds were provided by a combination of funds from: (1) Yasmin Construction, AMINI's company, in the amount of $120,721.52; (2) Phillip Wellington, by two checks in the amounts of $70,000 and $150,000; (3) S.S. in the amount of $45,000; and (4) MEHR in the amount of $10,000;

d. Fraudulently listed $701,287.09 as cash due to seller as though the entirety of this payment was paid to the seller, when, in truth and fact, such proceeds were divided up in a manner designed to conceal the fraud; and

e. Failed to disclose hidden kickbacks as set forth below.

241. Following the closing for 5020 Oxfordshire Road, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about February 20, 2007, a hidden kickback of $636,394.16 from the fraudulent mortgage proceeds were distributed to Yasmin Construction, AMINI's company;

b. On or about February 21, 2007, AMINI further distributed the mortgage proceeds from Yasmin Construction as follows, none of which was disclosed on the HUD-1:

- A hidden kickback of $110,400 to Phillip Wellington; and

- A hidden kickback of $65,000 to AMINI.

c. On or about February 22, 2007, AMINI further distributed the mortgage proceeds in the account of his company, Yasmin Construction as follows, none of which was disclosed on the HUD-1:

- A hidden kickback of $139,000 to Phillip Wellington; and

- A hidden kickback of $25,000 to another account controlled by AMINI.

242. While F.B. was the buyer and the loan documents represented that 5020 Oxfordshire Road, Waxhaw, North Carolina, would be her primary residence, in truth and fact:

a. F.B. never lived there; instead, MITCHELL moved into 5020 Oxfordshire Road, Waxhaw, North Carolina, following the closing; and

b F.B. never made mortgage payments on 5020 Oxfordshire Road, Waxhaw, North Carolina; instead, any mortgage payments were made, at most, by the Enterprise, prior to the Enterprise reselling the house.

243. The Enterprise let the loan payments lapse, and 5020 Oxfordshire Road, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $899,000 – over $1,100,000 less than the inflated purchase price.

### (12) February 26, 2007: Activity Related to 2718 Crane Road, Waxhaw

244. On or about February 26, 2007, the Enterprise fraudulently purchased 2718 Crane Road, Waxhaw, North Carolina, in the name of Hillian for an inflated price of $1,800,000, fraudulently obtaining loan proceeds totaling $1,612,029.

245. TYSON, Hillian, Phillips, Marcia Williams and other members of the Enterprise caused the loan package for Hillian's purchase of 2718 Crane Road, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That Hillian would live at 2718 Crane Road, Waxhaw, North Carolina, as his primary residence, when, in truth and fact, Hillian had no such intention and never moved into the property;

b. That Hillian had a monthly income of $50,447.33, when, in truth and fact, Hillian's monthly income was approximately $7,000 per month – more than $515,000 less than the annual income fraudulently stated;

c. That Hillian had over $250,000 on deposit with Wachovia Bank, when, in truth and fact, Taylor created a bogus verification of deposit supposedly from Wachovia Bank with a verification phone number controlled by Taylor; and

d. That Hillian would pay cash at closing, when, in truth and fact, Hillian had no such intention of paying cash at closing and did not.

246. TYSON, CARRIE TYSON, Hillian, Phillips, Marcia Williams and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for Hillian's purchase of 2718 Crane Road, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a. Failed to disclose the true agreed upon price;

b. Falsely stated that Hillian had provided $185,056.57 cash at closing, when, in truth and fact, Hillian only provided $10,400 cash at closing along with a cashier's check for $20,000, which was obtained from a company controlled by Hillian. The remainder of the down payment was provided, in truth and fact, by a combination of: (1) Brighton Developers, in the amount of $145,056.57, funded in part through proceeds of the Brighton Developers investment fraud scheme; (2) Metro Investment, a company controlled by TYSON AND CARRIE TYSON, in the amount of $6,000; (3) STIR, a company owned by Rick Phillips, in the amount of $9,400; and (4) $200 in cash;

c. Fraudulently listed a $450,539.11 payment as a builder's invoice to STIR LLC, as if STIR had been involved in building the property, when, in truth and fact, STIR was a nightclub that had nothing to do with building the property, but, as part of the scheme was to fraudulently receive the proceeds of the sale;

d. Listed a commission of $80,000 to the real estate agency that employed Marcia Williams, as if it were a legitimate commission payment for the real estate agent on the deal, when, in truth and fact, Marcia Williams was paid $79,710 for her participation in the scheme; and

e. Failed to disclose hidden kickbacks as set forth below.

247. Following the closing for 2718 Crane Road, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about February 27, 2007, $280,539.11 of the mortgage fraud proceeds were fraudulently distributed to STIR, purportedly as a consulting fee, though the HUD-1 indicated that $450,539.11 as a "builders invoice";

b. On or about February 27, 2007, the remainder of the $450,539.11 that was purportedly to be distributed to STIR as a "builders invoice" – a hidden kickback of $170,000 – was fraudulently distributed to Brighton Developers;

c. On or about March 1, 2007, a hidden kickback $9,126.89 from the mortgage fraud proceeds was fraudulently distributed to Marcia Williams; and

d.     On or about March 2, 2007, a hidden kickback of $120,000 from the mortgage fraud proceeds previously distributed to STIR were subsequently distributed to Hillian, through his company Supported Living Youth, Family, and Children Services.

248.     While Hillian was the buyer and represented that 2718 Crane Road, Waxhaw, North Carolina, would be his primary residence, in truth and fact:

a.     Hillian never lived there; instead, Rick Phillips lived there at some point; and

b     Hillian never made mortgage payments on 2718 Crane Road, Waxhaw, North Carolina; instead, any mortgage payments were made, at most, by the Enterprise, prior to the Enterprise reselling the house.

249.     The Enterprise let the loan payments lapse, and 2718 Crane Road, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $685,500 – over $1,113,000 less than the inflated purchase price.

### (13) March 20, 2007: Activity Related to 9911 Strike the Gold Lane, Waxhaw

250.     On or about March 20, 2007, the Enterprise fraudulently purchased 9911 Strike the Gold Lane, Waxhaw, North Carolina, in the name of A.M. for an inflated price of $1,570,000, fraudulently obtaining loan proceeds totaling $1,491,500.

251.     AMINI, Pasut, Mahaney, Osborne and other members of the Enterprise caused the loan package for A.M.'s purchase of 9911 Strike the Gold Lane, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a.     That A.M. would live at 9911 Strike the Gold Lane, Waxhaw, North Carolina, as his primary residence, when, in truth and fact, A.M. had no such intention and never moved into the property;

b.     That A.M.'s current address was 2131 Rolston Drive, Charlotte, North Carolina, when, in truth and fact, A.M. had never lived there;

c.     That A.M. had a monthly income of $45,000, when, in truth and fact, A.M.'s monthly income was approximately $4,500 per month – more than $450,000 less than the annual income fraudulently stated;

d.     That A.M. had $711,051 in Wachovia Bank accounts, when, in truth and fact, A.M. never had $711,051 in a Wachovia Bank account. Rather, Taylor created a bogus verification of deposit supposedly from Wachovia Bank with a verification phone number, controlled by Taylor;

e.      That A.M. would pay cash at closing, when, in truth and fact, A.M. had no such intention of paying cash at closing and did not; and

f.      That A.M.'s nearest living relative was Mahaney, when, in truth and fact, A.M. was not related to Mahaney.

252.    AMINI, Pasut, Mahaney, Osborne, Phillip Wellington and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for A.M.'s purchase of 9911 Strike the Gold Lane, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a.      Failed to disclose the true agreed upon price;

b.      Falsely stated that A.M. provided an earnest money deposit of $2,000, when, in truth and fact, A.M. provided no such earnest money deposit;

c.      Falsely stated that A.M. provided $75,975.13 cash at closing, when, in truth and fact A.M. provided no cash at closing. Instead, Phillip Wellington provided the down payment funds supposedly paid by A.M., with a check in the amount of $130,000;

d.      Fraudulently listed $133,000 payment as a commission to the real estate agency that employed Pasut as though it was a commission payment for the real estate agent on the deal, when, in truth and fact, Pasut was paid part of this $133,000 for her participation in the scheme and the remainder of such proceeds was divided up in a manner designed to conceal the fraud;

e.      Failed to disclose that the excess cash to close of $54,024.87 was provided by Phillip Wellington and paid to AMINI; and

f.      Failed to disclose hidden kickbacks as set forth below.

253.    Following the closing for 9911 Strike the Gold Lane, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a.      On or about March 21, 2007, $8,000 of the mortgage fraud proceeds were distributed to the company for which Pasut worked, notwithstanding the disclosure on the HUD-1 of a purported $133,000 commission;

b.      On or about March 21, 2007, a hidden kickback of $125,000 from the mortgage fraud proceeds – the remainder of the purported $133,000 commission to the real estate agency that employed Pasut – was distributed to Yasmin Construction, AMINI's company;

48

c.      On or about March 20, 2007, $54,024.87 of the mortgage fraud proceeds were distributed to AMINI; and

d.      On or about March 23, 2007, a hidden kickback of $5,000 from the mortgage fraud proceeds was distributed by Osborne to Mahaney.

254.    While A.M. was the buyer and the loan documents represented that 9911 Strike the Gold Lane, Waxhaw, North Carolina, would be his primary residence, in truth and fact:

a.      A.M. never lived there; and

b      A.M. never made mortgage payments on 9911 Strike the Gold Lane, Waxhaw, North Carolina; instead, any mortgage payments were made, at most, by the Enterprise.

255.    The Enterprise let the loan payments lapse, and 9911 Strike the Gold Lane, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $820,000 — over $650,000 less than the inflated purchase price.

### (14) March 22, 2007: Activity Related to 2817 Cutter Court, Waxhaw

256.    On or about March 22, 2007, the Enterprise fraudulently purchased 2817 Cutter Court, Waxhaw, North Carolina, in the name of Wallace for an inflated price of $1,750,000, fraudulently obtaining loan proceeds totaling $1,565,646.94.

257.    TYSON, HUNT, Phillips, Danielle Vaughn, Wallace, WOLF and other members of the Enterprise caused the loan package for Wallace's purchase of 2817 Cutter Court, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a.      That Wallace would live at 2817 Cutter Court, Waxhaw, North Carolina, as his primary residence, when, in truth and fact, Wallace had no such intention and never moved into the property;

b.      That Wallace was employed by United Business Concepts ("UBC") in Charlotte, when, in truth and fact, he was not;

c.      That Wallace had monthly income of $42,686.67, when, in truth and fact, he did not; and

d.      That Wallace would pay cash at closing, when, in truth and fact, Wallace had no such intention of paying cash at closing and did not.

258.    TYSON, HUNT, Phillips, Danielle Vaughn, Wallace, WOLF and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for Wallace's purchase of 2817

Cutter Court, Waxhaw to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

    a.    Failed to disclose the true agreed upon price;

    b.    Falsely stated that Wallace provided $183,997.67 cash at closing, when, in truth and fact, Wallace provided no cash at closing. Instead, the down payment was provided by a combination of: (1) CBIG, HUNT's company, in the amount of $100,000; (2) STIR, a company owned by Rick Phillips, in the amount of $40,000; and (3) Tracy Dwyer-Wallace in the amount of $44,454.00;

    c.    Fraudulently listed a $219,387.81 payment to Team Construction, purportedly for Design Fees/Allowance, when, in truth and fact, such proceeds were a kickback to Wallace for his participation in the scheme;

    d.    Fraudulently listed a $106,000.00 payment to CBIG, HUNT's company, purportedly for Construction Costs, when, in truth and fact, such proceeds were a kickback to HUNT for her participation in the scheme; and

    e.    Fraudulently listed a $140,000.00 payment to STIR, Rick Phillips' company, purportedly for Construction Costs, when, in truth and fact, such proceeds were a kickback to Rick Phillips for his participation in the scheme.

259. While Wallace was the buyer and represented that 2817 Cutter Court, Waxhaw, North Carolina, would be his primary residence, in truth and fact:

    a.    Wallace never lived there; instead, P.W., an associate of Phillips, moved into 2817 Cutter Court, Waxhaw, North Carolina; and

    b.    Wallace never made mortgage payments on 2817 Cutter Court, Waxhaw, North Carolina; instead, any mortgage payments were made, at most, by the Enterprise.

260. The Enterprise let the loan payments lapse, and 2817 Cutter Court, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $515,000 – $1,235,000 less than the inflated purchase price.

### (15) April 9, 2007: Activity Related to 9115 Woodhall Lake Drive, Waxhaw

261. On or about April 9, 2007, the Enterprise fraudulently purchased 9115 Woodhall Lake Drive, Waxhaw, North Carolina, in the name of A.M. for an inflated price of $3,200,000, fraudulently obtaining loan proceeds totaling $2,880,000.

262. AMINI, Rainer, Sean Williams and other members of the Enterprise caused the loan package for A.M.'S purchase of 9115 Woodhall Lake Drive, Waxhaw, North Carolina, to

contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That A.M. would live at 9115 Woodhall Lake Drive, Waxhaw, North Carolina, as his primary residence, when, in truth and fact, A.M. had no such intention and never moved into the property;

b. That A.M. had a monthly income of $63,520, when, in truth and fact, A.M.'s monthly income was approximately $4,500 per month – more than $700,000 less than the annual income fraudulently stated;

c. That A.M. had assets totaling more than $3,630,000, including $2,000,000 in a Bank of America account, when, in truth and fact, A.M. had neither $2,000,000 in a Bank of America account nor still owned the real estate supposedly valued at $1,630,000;

d. That A.M. would pay cash at closing, when, in truth and fact, A.M. had no such intention of paying cash at closing and did not; and

e. That A.M. had signed the purchase contract, when, in truth and fact, he had not.

263. AMINI, Rainer, Sean Williams and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for A.M.'s purchase of 9115 Woodhall Lake Drive, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a. Failed to disclose the true agreed upon price;

b. Falsely stated that A.M. had provided an earnest money deposit of $1,000, when, in truth and fact, A.M. provided no such earnest money deposit;

c. Falsely stated that A.M. provided $345,049.88 cash at closing, when, in truth and fact, A.M. provided no cash at closing. Instead, AMINI had the $345,049.88 that was supposed to be cash at closing netted out of his fraudulent proceeds; and

d. Fraudulently listed an $850,000 payment to Yasmin Construction, Amini's company, as if Yasmin Construction had done work on the property, when, in truth and fact, such proceeds were a fraudulent kickback for Amini's participation in the scheme.

264. Following the closing for 9115 Woodhall Lake Drive, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

     a.     On or about April 10, 2007, $503,938.12 (the $850,000 less the purported cash from borrower of $345,049.88) of the mortgage fraud proceeds were distributed to Yasmin Construction, AMINI's company.

265. While A.M. was the buyer and the loan documents represented that 9115 Woodhall Lake Drive, Waxhaw, North Carolina, would be his primary residence, in truth and fact:

     a.     A.M. never lived there; instead, BUMPERS moved into 9115 Woodhall Lake Drive, Waxhaw, North Carolina, paying Panayoton rent; and

     b     A.M. never made mortgage payments on 9115 Woodhall Lake Drive, Waxhaw, North Carolina; instead, any mortgage payments were made, at most, by the Enterprise.

266. The Enterprise let the loan payments lapse, and 9115 Woodhall Lake Drive, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $1,586,000 – over $1,610,000 less than the inflated purchase price.

### (16) April 12, 2007: Activity Related to 9215 Woodhall Lake Drive, Waxhaw

267. On or about April 12, 2007, the Enterprise fraudulently purchased 9215 Woodhall Lake Drive, Waxhaw, North Carolina, in the name of N.M. for an inflated price of $2,100,000, fraudulently obtaining loan proceeds totaling $1,917,822.40.

268. TYSON, THOROGOOD, Danielle Vaughn, WOLF, and other members of the Enterprise caused the loan package for N.M.'S purchase of 9215 Woodhall Lake Drive, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

     a.     That N.M. had over $350,000 on deposit with Wachovia, when, in truth and fact, N.M. did not have such funds on deposit. Rather, S.S. created a bogus verification of deposit supposedly from Wachovia Bank with a phone number, controlled by S.S., by which verifications of deposit could be made;

     b.     That N.M. had been a partner of NT & Associates for the last three years and that S.W. prepared N.M.'s taxes, when, in truth and fact, the letter was bogus; and

     c.     That N.M. would pay cash at closing, when, in truth and fact, N.M. had no such intention of paying cash at closing and did not.

269. TYSON, CARRIE TYSON, THOROGOOD, Danielle Vaughn, WOLF, Wittig, and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for N.M.'s purchase of 9215 Woodhall Lake Drive, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a.      Failed to disclose the true agreed upon price;

b.      Falsely stated that N.M. provided $215,886.90 as cash at closing, when, in truth and fact, N.M. provided no cash at closing. Instead, TYSON and CARRIE TYSON provided N.M.'s down payment funds, through a combination of: (1) a $50,000 check from Tyson; and (2) a $170,000 check from Brighton Developers, funded in part through proceeds of the Brighton Developers investment fraud scheme;

c.      Fraudulently listed a payment of $594,950 to Brighton Developers, as if Brighton Developers had done work on the property, when, in truth and fact, such proceeds were a kickback for TYSON's role in the scheme; and

d.      Listed a $56,000 payment to WOLF'S realty firm as if it were a legitimate commission, when, in truth and fact, WOLF was paid this $56,000 for his participation in the scheme.

270.    Following the closing for 9215 Woodhall Lake Drive, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a.      On or about April 13, 2007, $419,063.10 of the mortgage fraud proceeds were distributed to Brighton Developers;

b.      On or about April 13, 2007, $180,000 of the mortgage fraud proceeds were distributed to Brighton Developers; and

c.      On or about April 13, 2007, $95,000 of the mortgage fraud proceeds was distributed to NT & Associates, THOROGOOD's company.

271.    While N.M. was the supposed buyer, in truth and fact, she did not make the mortgage payments herself; instead, when mortgage payments were made, TYSON gave her the money to make the payments, or she made the payments at TYSON's direction, using TYSON's bank routing and account numbers, on behalf of the Enterprise.

272.    The Enterprise let the loan payments lapse, and 9215 Woodhall Lake Drive, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $660,000 – $1,440,000 less than the inflated purchase price.

**(17)  April 27, 2007:  Activity Related to 7824 Clover Vale Drive, Waxhaw**

273.  On or about April 27, 2007, the Enterprise fraudulently purchased 7824 Clover Vale Drive, Waxhaw, North Carolina, in the name of L.R. for an inflated price of $1,250,000, fraudulently obtaining loan proceeds totaling $1,125,000.

274.  PERRY, Lee, Mahaney, Kim Perry and other members of the Enterprise caused the loan package for L.R.'S purchase of 7824 Clover Vale Drive, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a.  That L.R. would live at 7824 Clover Vale Drive, Waxhaw, North Carolina, as her primary residence, when, in truth and fact, L.R. had no such intention and never moved into the property;

b.  That L.R. was self-employed by Quality Trucking Solutions, Inc. when, in truth and fact, L.R. never did any work for Quality Trucking Services;

c.  That L.R. had a monthly income of $33,400;

d.  That L.R. had stocks and bonds at Franklin Asset Management totaling $1,032,977, when, in truth and fact, L.R. had no account with Franklin Asset Management;

e.  That L.R. had put down a cash deposit of $2,500 with Gary Wood, when, in truth and fact, L.R. had put down no such cash deposit;

f.  That L.R. would pay cash at closing when, in truth and fact, L.R. had no such intention of paying cash at closing and did not;

g.  Submitting a fraudulent employment verification; and

h.  Submitting a fraudulent verification of rent or mortgage account.

275.  TYSON, PERRY, Lee, Mahaney, Kim Perry and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for L.R.'S purchase of 7824 Clover Vale Drive, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts.  For example, the HUD-1 Settlement Statement:

a.  Failed to disclose the true agreed upon price;

b.  Falsely stated that L.R. provided an earnest money deposit of $2,500, when, in truth and fact, L.R. provided no such earnest money deposit;

c.  Falsely stated that L.R. provided $127,307.36 cash at closing, when, in truth and fact, L.R. provided no cash at closing.  Instead, TYSON provided L.R.'s down payment funds;

d.      Fraudulently listed a disbursement of $219,420 to Perry Masonry Construction as if Perry Masonry Construction had done brick work on 7824 Clover Vale Drive, when, in truth and fact, such proceeds were divided up to conceal the fraud;

e.      Fraudulently listed a commission payment of $31,000 to Gene Davis Realty, as though it was a commission payment for the real estate agent on the deal, when, in truth and fact, the $31,000 was a kickback to Gary Wood for his participation in the scheme;

f.      Listed a commission of $78,000 to New Millennium Brokerage Service as if it were a legitimate brokerage commission, for the real estate agent on the deal, when, in truth and fact, the $78,000 was compensation to Lee for her participation in the scheme; and

g.      Failed to disclose hidden kickbacks as set forth below.

276.    Following the closing for 7824 Clover Vale Drive, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a.      On the dates indicated below, PERRY and Kim Perry distributed the $219,420 mortgage fraud proceeds received by Perry Masonry Construction in the following manner, none of which was disclosed as payments on the HUD-1:

- On April 30, 2007, a hidden kickback of $65,000 to Kim Perry;

- On May 1, 2007, PERRY withdrew a hidden kickback of $46,000 cash;

- On May 1, 2007, PERRY also withdrew a hidden kickback of $50,000, in the form of a check made out to Kim Perry;

- On May 1, 2007, Kim Perry wired a hidden kickback of $100,000 to Brighton Developers; and

- On May 4, 2007, Kim Perry wired a hidden kickback of $9,000 from the mortgage fraud proceeds in an account in the name of Quality Trucking Solution, a company she controlled, account into an account of Brighton Developers.

b.      On or about May 1, 2007, Lee distributed a hidden kickback of $12,000 to Mahaney.

277.    While L.R. was the buyer and the loan documents represented that 7824 Clover Vale Drive, Waxhaw, North Carolina, would be her primary residence, in truth and fact:

a.      L.R. never lived there; and

b     While L.R. took a loan to make the first mortgage payment, TYSON subsequently took out a loan in L.R.'s name for $40,000, had L.R. sign over the loan proceeds to TYSON, and then made two mortgage payments for her, before letting the loan payments lapse.

278.     The Enterprise let the loan payments lapse, and 7824 Clover Vale Drive, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $626,500 – over $620,000 less than the inflated purchase price.

### (18) May 7, 2007: Activity Related to 1212 Lookout Circle, Waxhaw

279.     On or about May 7, 2007, the Enterprise fraudulently purchased 1212 Lookout Circle, Waxhaw, North Carolina, in the name of Kevin Smith for an inflated price of $1,470,000, fraudulently obtaining loan proceeds totaling $1,323,000.

280.     TYSON, WOOD, Kevin Smith and other members of the Enterprise caused the loan package for Kevin Smith's purchase of 1212 Lookout Circle, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a.     That Smith had a monthly income of $39,583, when, in truth and fact, he did not; and

b.     That Smith would pay cash at closing, when, in truth and fact, Smith had no such intention of paying cash at closing and did not.

281.     TYSON, WOOD, Kevin Smith and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for Kevin Smith's purchase of 1212 Lookout Circle, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a.     Failed to disclose the true agreed upon price;

b.     Falsely stated that Smith provided $165,365.06 cash at closing, when, in truth and fact, Smith provided no cash at closing. Instead, TYSON provided Smth's down payment funds with a cashier's check;

c.     Fraudulently listed $477,415.36 as cash due to seller as though the entirety of this payment was paid to the seller, when, in truth and fact, such proceeds were divided in a manner designed to conceal the fraud;

d.     Fraudulently listed a $363,000 payment to Sycamore Consulting Group for home improvements, when, in truth and fact, this disbursement was further divided in a manner designed to conceal the fraud; and

e. Failed to disclose hidden kickbacks as set forth below.

282. Following the closing for 1212 Lookout Circle, Waxhaw, North Carolina,, the Enterprise divided the fraudulent proceeds to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about May 8, 2007, $470,000 of the mortgage fraud proceeds were distributed to Sycamore Consulting, only $363,000 of which were disclosed on the HUD-1 and even then were falsely shown as if Sycamore had some role in building the house; and

b. On or about May 9, 2007, WOOD, on behalf of his company Sycamore Consulting, then further distributed $441,732 of mortgage fraud proceeds in the following manner, none of which was disclosed as payments on the HUD-1:

- A hidden kickback of $245,599 to Kevin Smith;

- A hidden kickback of $191,133 to Brighton Developers; and

- A hidden kickback of $5,000 to WOOD.

283. The Enterprise let the loan payments lapse, and 1212 Lookout Circle, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $720,000 – over $750,000 less than the inflated purchase price.

### (19) June 20, 2007: Activity Related to 606 Beauhaven Lane, Waxhaw

284. On or about June 20, 2007, the Enterprise fraudulently purchased 606 Beauhaven Lane, Waxhaw, North Carolina, in the name of MEHR for an inflated price of $1,500,000, fraudulently obtaining loan proceeds totaling $1,425,000.

285. AMINI, Sean Williams, MEHR, Rainer and other members of the Enterprise caused the loan package for MEHR'S purchase of 606 Beauhaven Lane, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That MEHR owned real estate worth $300,000 when, in truth and fact, the real estate was worth approximately $200,000;

b. That MEHR had paid a cash deposit on the sales contract of $1,000, when, in truth and fact, MEHR had paid no such deposit; and

c. That MEHR would pay cash at closing, when, in truth and fact, MEHR had no such intention of paying cash at closing and did not.

57

286.    AMINI, Sean Williams, Rainer and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for MEHR'S purchase of 606 Beauhaven Lane, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a.    Failed to disclose the true agreed upon price;

b.    Falsely stated that MEHR provided an earnest money deposit of $1,000, when, in truth and fact, MEHR provided no such earnest money deposit;

c.    Falsely stated that MEHR provided $84,991.03 cash at closing, when, in truth and fact, MEHR provided no cash at closing. Instead, the down payment was netted out of the seller's proceeds;

d.    Fraudulently listed $477,382.66 as cash due to seller as though the entirety of this payment was paid to the seller, when, in truth and fact, such proceeds were divided to conceal the fraud;

e.    Fraudulently listed fees to SW Mortgage Group as $250, $300 and $16,071, when, in truth and fact, SW Mortgage was disbursed $24,507.87; and

f.    Failed to disclose hidden kickbacks as set forth below.

287.    Following the closing for 606 Beauhaven, Waxhaw, North Carolina, the Enterprise divided the fraudulent proceeds to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a.    On or about June 26, 2007, a hidden kickback of $44,000 to Network Imports, M.D.'s company;

b.    On or about June 22, 2007, a hidden kickback of $43,758.63 to Camron Transportation, AMINI's company;

c.    On or about June 22, 2007, a hidden kickback of $303,663 to S.A., MEHR'S mother-in-law;

d.    On or about June 21, 2007, a hidden kickback of $24,507.87 to SW Mortgage Group, Sean Williams' company, while only $16,621 was disclosed on the HUD-1;

e.    On or about June 21, 2007, a hidden kickback of $1,000 to Rainer; and

f.    On or about June 28, 2007, MEHR further distributed the $303,663 in mortgage fraud proceeds by distributing a hidden kickback of $125,000 to AMINI.

288.    The Enterprise let the loan payments lapse, and 606 Beauhaven Lane, Waxhaw, North Carolina, fell into foreclosure.    The property resold after foreclosure for $540,000 – $960,000 less than the inflated purchase price.

### (20)  July 12, 2007:  Activity Related to 8304 Skye Lochs Drive, Waxhaw

289.    On or about July 12, 2007, the Enterprise fraudulently purchased 8304 Skye Lochs Drive, Waxhaw, North Carolina, in the name of Tyler for an inflated price of $1,400,000, fraudulently obtaining loan proceeds totaling $1,259,860.

290.    Lee, HUBBARD, Tyler and other members of the Enterprise caused the loan package for Tyler's purchase of 8304 Skye Lochs Drive, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

    a.    That Tyler would live at 8304 Skye Lochs Drive, Waxhaw as her primary residence, when, in truth and fact, Tyler had no intention of making 8304 Skye Lochs Drive, Waxhaw, North Carolina, her primary residence;

    b.    That Tyler had monthly income of $42,550, when, in truth and fact, she had no such income; and

    c.    That Tyler would provide cash at closing when, in truth and fact, Tyler had no such intention of paying cash at closing and did not.

291.    TYSON, BUMPERS, Lee, HUBBARD, Tyler and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for Tyler's purchase of 8304 Skye Lochs Drive, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts.  For example, the HUD-1 Settlement Statement:

    a.    Failed to disclose the true agreed upon price.

    b.    Falsely stated that Tyler provided $124,009.84 cash at closing, when, in truth and fact, Tyler provided no cash at closing.  Instead, BUMPERS provided Tyler's down payment funds through a wire from his company New Century Homes;

    c.    Fraudulently listed a commission payment of $47,000 to Gene Davis Realty, as through it as a commission payment for the real estate agent on the deal, when, in truth and fact, the $47,000 was a kickback to Gary Wood for his participation in the scheme;

    d.    Fraudulently listed a commission payment of $50,000 to New Millennium Broker Service, as though it was a commission payment for a real estate agent on the deal, when, in truth and fact, the $50,000 was a kickback to Lee for her participation in the scheme;

e.      Fraudulently listed a $155,000 payment to Brighton Developers as if it were for masonry work, when, in truth and fact, the $155,000 was a kickback to TYSON for his participation in the scheme;

g.      Fraudulently listed a $119,672.90 payment to Strongwill Construction, LLC as if it were for construction costs, when, in truth and fact, the $119,672.90 was a kickback to HUBBARD for his participation in the scheme; and

h.      Failed to disclose hidden kickbacks as set forth below.

292.    Following the closing for 8304 Skye Lochs Drive, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a.      On or about July 12, 2007, $47,000 of the mortgage fraud proceeds were distributed to Gene Davis Realty as a kickback to Gary Wood;

b.      On or about July 12, 2007, $50,000 of the mortgage fraud proceeds were distributed to New Millennium, Lee's company;

c.      On or about July 12, 2007, $155,000 of the mortgage fraud proceeds were distributed to Brighton Developers;

d.      On or about July 12, 2007, $119,672.90 of the mortgage fraud proceeds were distributed to Strongwill Construction, HUBBARD's company;

e.      On or about July 19, 2007, TYSON distributed to BUMPERS a hidden kickback of $62,000 from the $155,000 in mortgage fraud proceeds he received; and

f.      On or about July 24, 2007, Hubbard distributed to Tyler a hidden kickback of $79,010 from $119,672.90 mortgage fraud proceeds he received.

293.    While Tyler was the buyer and represented that 8304 Skye Lochs Drive, Waxhaw, North Carolina, would be her primary residence, in truth and fact, Tyler never made it her primary residence, and the Enterprise used the property to shoot a movie.

294.    The Enterprise let the loan payments lapse, and 8304 Skye Lochs Drive, Waxhaw, North Carolina, fell into foreclosure. The property resold after foreclosure for $553,000 – $847,000 less than the inflated purchase price.

### (21) August 7, 2007: Activity Related to 1625 Lookout Circle, Waxhaw

295.    On or about August 7, 2007, the Enterprise fraudulently purchased 1625 Lookout Circle, Waxhaw, North Carolina, in the name of L.S. for an inflated price of $1,450,000, fraudulently obtaining loan proceeds totaling $1,304,855.

296. BUMPERS, Danielle Vaughn, MCDOWELL, and other members of the Enterprise caused the loan package for L.S.' purchase of 1625 Lookout Circle, Waxhaw, North Carolina, to contain a number of false and fraudulent representations and half-truths and to omit or conceal material facts, including:

a. That L.S. would live at 1625 Lookout Circle, Waxhaw, North Carolina, as her primary residence, when, in truth and fact, L.S. had no such intention and never moved into the property;

b. That L.S. had paid a cash deposit on the sales contract of $1,000, when, in truth and fact, L.S. had paid no such deposit;

c. That L.S. was employed by New Century Homes, when, in truth and fact, she never worked for New Century Homes;

d. That L.S. had a monthly income of $25,000, when, in truth and fact, L.S. had no such monthly income;

e. That L.S. had more than $300,000 on deposit at Scottsdale Financial Solutions, when, in truth and fact, L.S. had no such account, and the verification of deposit supporting that lie was bogus; and

f. That L.S. would pay cash at closing, when, in truth and fact, L.S. had no such intention of paying cash at closing and did not.

297. BUMPERS, Danielle Vaughn, MCDOWELL and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for L.S.' purchase of 1625 Lookout Circle, Waxhaw, North Carolina, to contain false and fraudulent representations, half-truths, and to omit or conceal material facts. For example, the HUD-1 Settlement Statement:

a. Failed to disclose the true agreed upon price;

b. Falsely stated that L.S. provided an earnest money deposit of $1,000, when, in truth and fact, L.S. provided no such deposit;

c. Falsely stated that L.S. provided $170,041.64 cash at closing, when, in truth and fact, L.S. provided no cash at closing. Instead, BUMPERS wired $170,000 from a New Century account to L.S.'s account, and, on the day of the closing, MCDOWELL took L.S. to a Bank of America branch to get two cashier's checks for the down payment, using the money that had been wired by BUMPERS;

d. Fraudulently listed a $441,500 payoff to Pathways Consultants, as if Pathways Consultants had done work on the property, when, in truth and fact, such proceeds were distributed in a manner to conceal the disbursement of the fraudulent proceeds; and

e.     Failed to disclose hidden kickbacks as set forth below.

298.     Following the closing for 1625 Lookout Circle, Waxhaw, North Carolina, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a.     On or about August 7, 2007, $441,500 of the mortgage fraud proceeds were fraudulently distributed to Pathways Consultants; and

b.     On or about August 9, 2007, the entirety of the $441,500 mortgage fraud proceeds distributed to Pathways Consultants was then wired to New Century Homes, a company controlled by BUMPERS, as a hidden kickback.

299.     While L.S. was the buyer and the loan documents represented that 1625 Lookout Circle, Waxhaw, North Carolina, would be her primary residence, in truth and fact:

a.     L.S. never lived there; instead, BUMPERS and MCDOWELL moved into 1625 Lookout Circle, Waxhaw, North Carolina, following the closing; and

b     L.S. never made mortgage payments on 1625 Lookout Circle, Waxhaw, North Carolina; instead, any mortgage payments were made, at most, by the Enterprise.

300.     The Enterprise let the loan payments lapse, and 1625 Lookout Circle, Waxhaw, North Carolina, fell into foreclosure.  The property resold after foreclosure for $512,000 – $888,000 less than the inflated purchase price.

### (22) August 17, 2007:  Lots 31, 32, 38, 39, and 42 Chambery Subdivision

301.     On or about August 17, 2007, the Enterprise fraudulently purchased Lots 31, 32, 38, 39 and 42 in the Chambery Subdivision ('the Chambery Lots"), Charlotte, North Carolina, in the name of New Century Homes of Carolina, Inc. for an inflated price of $1,025,421, fraudulently obtaining loan proceeds totaling $1,341,900.

302.     TYSON, BUMPERS and other members of the Enterprise likewise caused the HUD-1 Settlement Statement for New Century Homes' purchase of the Chambery Lots to contain false and fraudulent representations, half-truths, and to omit or conceal material facts.  For example, the HUD-1 Settlement Statement:

a.     Failed to disclose the true agreed upon price;

b.     Falsely stated that a $425,000 assignment fee was due to Brighton Developers; and

c.     Failed to disclose hidden kickbacks as set forth below.

303. Following the closing for New Century Homes' purchase of the Chambery Lots, the Enterprise divided up the fraudulent proceeds in a manner designed to conceal the true recipients who would receive, own and control the proceeds of the fraud, including:

a. On or about August 21, 2007, $425,000 of the mortgage fraud proceeds were distributed to Brighton Developers; and

b. On or about August 22, 2007, a hidden kickback of $320,000 from the mortgage fraud proceeds was then paid from a Brighton Developers account to an account of New Century Homes of the Carolinas, a company controlled by BUMPERS, and the purchaser in this transaction.

304. The Enterprise let the loan payments lapse, and the Chambery Lots fell into foreclosure. The property resold after foreclosure for $605,000 – $420,000 less than the inflated purchase price.

## C. Distribution of Illegal Drugs

305. The Enterprise, by and through TYSON, AMINI, Davis, and others known and unknown to the Grand Jury, also engaged in marijuana transportation.

306. Specifically, TYSON, Davis, and other members of the Enterprise did transport truckloads of marijuana from Texas and elsewhere to North Carolina and elsewhere, using trucks controlled by AMINI and others. As noted above, AMINI used his trucking operations to solicit victims for the investment fraud operations of the Enterprise, and used AMINI's trucking company, Camron Transportation, and its accounts to receive criminal proceeds from, and to pay the expenses of, the mortgage fraud operations of the Enterprise.

307. TYSON and other members of the Enterprise solicited certain persons to participate in both the financial and drug trafficking criminal operations of the Enterprise, with such illegal drug trafficking enhancing the image and "street credibility" of the Enterprise to such persons.

## D. Bank Bribery

### (1) Manner and Means of the Bank Bribery Conspiracy

308. From in or about August 2007 through in or about September 2007, some of the members of the Enterprise and others carried out an additional scheme to bribe bank employees to further the objectives of the Enterprise.

309. In particular, members of the Enterprise bribed bank employees to cash checks received from fraudulent mortgage transactions carried out by the Enterprise, to deposit said checks in a manner designed to further conceal the true distribution of the proceeds, to supply false letters of credit in the names of local banks in an attempt to obtain financing from other financial institutions, and for other reasons known and unknown to the Grand Jury.

310. To further the activities of the Enterprise, Flood, Lee, TYSON, and others would pay bribes of between $7,500 and $30,000 to Henson and others for bogus letters of credit.

311. In exchange for such bribes, Henson generally would receive the text of the desired bogus letters by email, and would then transcribe such text onto bank letterhead.

312. Such bogus letters of credit would state, for example, that the financial institution would "hereby open our irrevocable standby credit on behalf of [entity] for the sum or sums not to exceed the aggregate amount of five million ($5,000,000)."

313. The bribes were paid to the bank employees by check and by cash.

### (2) Overt Acts of the Bank Bribery Conspiracy

314. In furtherance of the conspiracy, and to accomplish the objects of the bank bribery conspiracy, and to further the objectives of the Enterprise, Defendants TYSON, Lee, Marcia Williams and their co-conspirators committed one or more the following overt acts in the Western District of North Carolina, and elsewhere:

315. On or about August 22, 2007, TYSON wired $7,500 from an account registered to Brighton Developers, a company he controlled, to an account controlled by Lee in the name of New Millennium Brokerage Services, to be used, in part, to bribe Henson.

316. On or about August 29, 2007, $35,000 was wired from New Century, a company BUMPERS controlled, to an account controlled by Lee in the name of New Millennium Brokerage Services, to be used, in part, to bribe Henson.

317. On or about August 27, 2007, Henson provided the Enterprise with a bogus standby letter of credit supposedly from Bank of America stating that "We, Bank of America, hereby open our irrevocable standby credit on behalf of Brighton Developers for the sum or sums not to exceed the aggregate amount of one million (1,000,000)."

318. On or about August 29, 2007, Lee provided Flood with a cashier's check in the amount of $25,000 to be used, in part, to bribe Henson.

319. On or about September 4, 2007, Flood paid an $8,000 cash bribe to Henson that Henson promptly deposited into her personal account.

320. In addition to the $8,000 cash paid to Henson on or about September 4, 2007, Flood had paid Henson, from money received from Lee, an additional $2,000 in association with Henson's production of the letter of credit for TYSON and Brighton Developers.

321. On or about September 4, 2007, Henson provided the Enterprise with a bogus standby letter of credit supposedly from Bank of America stating that "We, Bank of America,

hereby open our irrevocable standby credit on behalf of New Century Homes of the Carolina for the sum or sums not to exceed the aggregate amount of five million (5,000,000)."

### E.    Perjury

322.    On or about January 23, 2008, the Grand Jury was conducting an investigation of the Enterprise and its activities to determine whether violations of Title 18, United States Code, Sections 1014 (false statements in relation to a loan), 1341 (mail fraud), 1343 (wire fraud), and 1344 (bank fraud) had been committed, and to identify the persons who had committed, caused the commission of, and conspired to commit such violations.

323.    It was material to said investigation that the Grand Jury determine whether TYSON had produced all documents in response to the Grand Jury subpoena.

324.    On or about January 23, 2008, TYSON, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declaration in response to questions with respect to the material matter alleged, namely what documents were outstanding for production and who had possession of those documents, as follows:

Q.    And after looking through the stack of documents is that all the documents that you intended to produce to this Grand Jury as of December 2007?

A.    No.

Q.    Please explain.

A.    Basically I'm waiting for accounting records from my accountant for extended taxes and I was -- I'm still searching for more documents to comply with the subpoena.

Q.    And who is your accountant?

A.    Frederick Gibson.

....

Q.    When -- And just to be clear, you testified that you also had accounting records --

A.    Yes.

Q.    -- to be received -- in the custody of Mr. Gibson, right?

A.    Yes.

...

Q. When did you request such records from Mr. Gibson?

A. Basically I had an extension of my '06 taxes and '07's will be complete but, like I said, Mr. Gibson, he's providing everything that I've requested as quickly as possible.

Q. Sir, the question was when you requested those documents from Mr. Gibson.

A. You said when did I?

Q. Yes.

A. Probably 30 days ago.

325. The above underscored testimony of TYSON, as he then well knew and believed, was false, in that, Mr. Gibson never had TYSON as a client, and had not been asked to gather any accounting documents on behalf of TYSON or his companies.

## COUNT ONE

**18 U.S.C. § 1962(d)**
**(Racketeering Conspiracy)**

326. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 307 of the Bill of Indictment, and further alleges that:

327. From in or about 2005 through in or about the present, in Mecklenburg and Union Counties, within the Western District of North Carolina and elsewhere, the defendants,

**(1) RAMIN AMINI**
**(2) VONETTA TYSON BARNES**
**(3) TRAVIS BUMPERS**
**(4) GLYNN HUBBARD**
**(5) VICTORIA HUNT**
**(6) TOBY HUNTER**
**(8) JOHN MCDOWELL**
**(9) KUROSH MEHR**
**(10) ANN TYSON MITCHELL**
**(11) JOHN WAYNE PERRY, JR.**
**(12) DONTE THOROGOOD**
**(13) CARRIE TYSON**
**(14) JAMES TYSON, JR.**
**(15) JAMES TYSON, SR.**
**(16) NATHAN SHANE WOLF**
**(17) PURNELL WOOD**

being persons associated with or employed by the Enterprise, which engaged in, and which activities of which affected interstate commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of that Enterprise through a pattern of racketeering activity, as that term is defined by 18 U.S.C. § 1961(1) and (5), involving multiple acts indictable or chargeable under:

a. Title 15, United States Code, Section 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud);

b. Title 18, United States Code, Section 1344 (bank fraud);

c. Title 18, United States Code, Section 1343 (wire fraud);

d. Title 18, United States Code, Section 1956(h) (money laundering conspiracy); and

e Title 21, United States Code, Sections 841 and 846 (possession with intent to distribute illegal drugs).

67

328.     It was a part of the conspiracy that the defendants agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

### 15 U.S.C. § 78j(b), 78ff
### (Securities Fraud)

329. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 325 of the Bill of Indictment, and further alleges that:

330. From in or about 2006 through in or about the present, in Mecklenburg and Union Counties, within the Western District of North Carolina and elsewhere, the defendants,

(2) VONETTA TYSON BARNES
(3) TRAVIS BUMPERS
(5) VICTORIA HUNT
(6) TOBY HUNTER
(7) STEVEN JONES
(8) JOHN MCDOWELL
(13) CARRIE TYSON
(14) JAMES TYSON, JR.
(15) JAMES TYSON, SR.

willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon investor victims and others, in connection with the sale of securities, to wit, the Brighton Developers, Sovereign Equity, Prestige, Global Motorist and Elite Automotive investment contracts.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17 Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## COUNT THREE

### 18 U.S.C. § 1344
### (Mortgage Fraud Scheme)

331. The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 325 of the Bill of Indictment, and further alleges that:

332. From in or about 2005 through in or about 2007, in Mecklenburg and Union Counties, within the Western District of North Carolina and elsewhere, the defendants,

**(1) RAMIN AMINI**
**(3) TRAVIS BUMPERS**
**(4) GLYNN HUBBARD**
**(5) VICTORIA HUNT**
**(8) JOHN MCDOWELL**
**(9) KUROSH MEHR**
**(10) ANN TYSON MITCHELL**
**(12) DONTE THOROGOOD**
**(13) CARRIE TYSON**
**(15) JAMES TYSON, JR.**
**(16) NATHAN SHANE WOLF**
**(17) PURNELL WOOD**

and others known and unknown to the Grand Jury, aiding and abetting one another, with the intent to defraud, did knowingly and intentionally devise the above described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did knowingly execute and attempt to execute the above described scheme and artifice to defraud and to obtain by means of false and fraudulent pretenses, representations and promises, money, funds, and credit under the custody and control of a federally insured financial institution.

All in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT FOUR

### 18 U.S.C. § 1343
### (Wire Fraud Scheme to Defraud Investors)

333.   The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 325 of the Bill of Indictment, and further alleges that:

334.   From in or about 2006 through in or about the present, in Mecklenburg and Union Counties, within the Western District of North Carolina and elsewhere, the defendants,

**(2) VONETTA TYSON BARNES**
**(3) TRAVIS BUMPERS**
**(5) VICTORIA HUNT**
**(6) TOBY HUNTER**
**(7) STEVE JONES**
**(8) JOHN MCDOWELL**
**(13) CARRIE TYSON**
**(14) JAMES TYSON, JR.**
**(15) JAMES TYSON, SR.**

and others known and unknown to the Grand Jury, aiding and abetting one another, with the intent to defraud, did knowingly and intentionally devise the above described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did cause to be transmitted by means of wire communication in interstate commerce any writing, signal, or sound, to wit, the defendants, while located in Waxhaw and Mecklenburg Counties, North Carolina, did send or cause to be sent emails, telephone calls, and wire transfers to and from each other, banks, and investor victims and their intermediaries in other States.

All in violation of Title 18, United States Code, Sections 1343 and 2.

71

## COUNT FIVE

### 18 U.S.C. § 1956(h)
### (Money Laundering Conspiracy)

335.  The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 325 of the Bill of Indictment, and further alleges that:

336.  From in or about 2005 through in or about the present, in Mecklenburg and Union Counties, within the Western District of North Carolina and elsewhere, the defendants,

(1) RAMIN AMINI
(2) VONETTA TYSON BARNES
(3) TRAVIS BUMPERS
(4) GLYNN HUBBARD
(5) VICTORIA HUNT
(6) TOBY HUNTER
(7) STEVEN JONES
(8) JOHN MCDOWELL
(9) KUROSH MEHR
(10) ANN TYSON MITCHELL
(11) JOHN WAYNE PERRY, JR.
(12) DONTE THOROGOOD
(13) CARRIE TYSON
(14) JAMES TYSON, JR.
(15) JAMES TYSON, SR.
(16) NATHAN SHANE WOLF
(17) PURNELL WOOD

did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to commit offenses against the United States, to wit, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity and to conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) (promotion money laundering), and 1956(a)(1)(B)(i) (concealment money laundering).

## COUNT SIX

### 18 U.S.C. § 371
### (Bank Bribery Conspiracy)

337.     The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 325 of the Bill of Indictment, and further alleges that:

338.     From in or about August 2007 through in or about September 2007, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendants,

### (3) TRAVIS BUMPERS
### (14) JAMES TYSON, JR.

did knowingly combine, conspire, confederate, and agree with each other and with Mcclain, Flood, Gray, Brown, Ramey, Lee, Marcia Williams and others known and unknown to the Grand Jury, to commit offenses against the United States, including violations of Title 18, United States Code, Section 215 (bank bribery).

### Object of the Conspiracy

339.     It was a part and an object of the conspiracy the defendants, and others known and unknown to the Grand Jury, would and did corruptly give, offer, and promise something of value to employees of financial institutions, and would and did corruptly accept and agree to accept something of value, being employees of financial institutions, all with the intent to influence and reward and be influenced and rewarded in connection with the transactions and business of financial institutions, in violation of Title 18, United States Code, Section 215.

### Manner and Means

340.     The defendants and others known and unknown to the Grand Jury carried out the conspiracy in the manner and means described in paragraphs 308 through 313 of the Bill of Indictment, among others.

### Overt Acts

341.     In furtherance of the conspiracy, and to accomplish the objects thereof, the defendants and their co-conspirators committed one or more of the overt acts set forth in paragraphs 314 through 321 of this Bill of Indictment in the Western District of North Carolina and elsewhere.

All in violation of Title 18, United States Code, Sections 371 and 2.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

342.     Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given of 18 U.S.C. §§ 982 and 1963, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c).  The following property is subject to forfeiture in accordance with Section 982, 1963, 853, and/or 2461(c):

(a)     All property which constitutes or is derived from proceeds obtained directly or indirectly as a result of violations of 18 U.S.C. §§ 1962(d), 1344, 1343, and 371, and 15 U.S.C. § 78j(b) and 78ff set forth in this bill of indictment;

(b)     All property involved in the violations of 18 U.S.C. § 1956(h) or traceable to property involved in such violations;

(c)     Any interest acquired or maintained in violation of 18 U.S.C. § 1962;

(d)     Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which any person charged herein established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962;

(e)     If, as set forth in 18 U.S.C. § 1963(m) and 21 U.S.C. § 853(p), any property described above cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendants to the extent of the value of the property described above.

343. The Grand Jury finds probable cause to believe that the property subject to forfeiture on one or more of the grounds stated above includes, but is not limited to, the following property:

(a) A forfeiture money judgment in the amount of at least $75,000,000, such amount constituting the proceeds of the violations set forth in this bill of indictment; and

(b) Approximately $35,158.95 in funds seized from Bank of America Account XXXXXXXX6363, such account held in the name of XYZ Brighton Developers, LLC.

A TRUE BILL

DAVID A. BROWN
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY CONFERRED BY 28 U.S.C. § 215

_Kurt W. Meyer_

KURT W. MEYERS
ASSISTANT UNITED STATES ATTORNEY

_Maria K. Vento_

MARIA K. VENTO
ASSISTANT UNITED STATES ATTORNEY